1  KENNETH J. NOLAN, Esq. (SBN 603406)
   MARCELLA AUERBACH, Esq. (SBN 249335)
2  NOLAN & AUERBACH, P.A.
   435 N. Andrews Ave., Suite 401
3  Fort Lauderdale, FL 33301
   (954) 779-3943
4  (954) 779-3937 (fax)

5  MATTHEW B. PAVONE, Esq. (SBN 94965)                    **F I L E D**
   NOLAN & AUERBACH, P.A.
6  Courtyard Square                                       AUG X 1 2008
   750 Grant Avenue, Suite 250
7  Novato, CA 94945                                RICHARD W. WIEKING
   (415) 209-9610                                  CLERK, U.S. DISTRICT COURT,
8  (415) 892-0337 (fax)                        NORTHERN DISTRICT OF CALIFORNIA

9  Attorneys for Plaintiff John Prieve

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA; and
    THE STATES OF ILLINOIS,                          )  Civil Action No.
15  CALIFORNIA, FLORIDA, TEXAS,                      )  C08-1863 WDB TEH
    DELAWARE, HAWAII, INDIANA,                       )
16  LOUISIANA, NEW HAMPSHIRE,                        )  FIRST AMENDED FALSE
    NEVADA, TENNESSEE, MICHIGAN,                     )  CLAIMS ACT COMPLAINT
17  NEW MEXICO, NEW YORK, and                        )
    THE COMMONWEALTHS OF                             )  FILED UNDER SEAL
18  MASSACHUSETTS and VIRGINIA; and                  )  PURSUANT TO
    THE DISTRICT OF COLUMBIA;                        )  31 U.S.C. §3730(b)(2)
19  ex rel. JOHN PRIEVE.                             )
                                                     )
20          Plaintiffs and Relator                   )
                                                     )
21  v.                                               )
                                                     )
22  MALLINCKRODT, INC.                               )      BY FAX
    COVIDIEN, INC., and                              )
23  TYCO INTERNATIONAL (US), INC.                    )
                                                     )
24          Defendants                               )

25              FIRST AMENDED FALSE CLAIMS ACT COMPLAINT

26                          INTRODUCTION

27      1.      *Qui tam* Relator JOHN PRIEVE brings this action on behalf of the United States

28  against MALLINCKRODT, INC., et al (hereinafter collectively referred to as Defendants) for

treble damages and civil penalties arising from Defendants' conduct in violation of the Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). The violations arise out of requests for payment by Medicaid, Medicare, TRICARE, and other federally-funded government healthcare programs (hereinafter collectively referred to as "Government Healthcare Programs").

1.      This action is also brought under the respective qui tam provisions of False Claims Acts (or similarly named) on behalf of the STATE OF ILLINOIS, the STATE OF CALIFORNIA, the STATE OF FLORIDA, the STATE OF TEXAS; the COMMONWEALTH OF MASSACHUSETTS; the STATE OF DELAWARE; the DISTRICT OF COLUMBIA, the STATE OF HAWAII, the STATE OF INDIANA, the STATE OF LOUISIANA, the STATE OF NEW HAMPSHIRE, the STATE OF NEVADA, the STATE OF TENNESSEE, the STATE OF MICHIGAN, the STATE OF NEW MEXICO, THE STATE OF NEW YORK, and the COMMONWEALTH OF VIRGINIA. These states, along with the UNITED STATES, are hereafter collectively referred to as the Government.

2.      This Complaint describes violations of the False Claims Act by offering and paying to physicians and other healthcare providers (hereinafter sometimes collectively referred to as "providers"), to induce them to prescribe certain pharmaceutical products. The practices, part of a highly organized and often blatant campaign, involved paying physicians as "consultants," and included: (1) Providing payments for phony drug trials and phony data collection; (2) Providing kickbacks in the form of lavish entertainment, (3) Providing phony speaker fees a/k/a "honorariums"; (4) Providing payments for phony preceptorships; (5) Using "advisory panel meetings" as inducements; (6) Creating phony paperwork programs as a means to provide kickbacks. This Complaint also describes violations of the False Claims Act by actively promoting certain products for "off-label" uses, which uses were not covered under any Government Program.

3.      Relator has complied with all procedural requirements of the laws under which this case is brought.

4.      Relator is informed and believes that the pervasive kickbacks and false claims described herein began at latest in 2004, and continues to date.

1 |

## FEDERAL JURISDICTION AND VENUE

2 |  5.  The acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred
3 | in part in the Northern District of California, and Defendants do business in the Northern District
4 | of California. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732(a),
5 | as well as under 28 U.S.C. § 1345. This Court has jurisdiction over this case for the claims
6 | brought on behalf of the states (referenced in paragraph 2) pursuant to 31 U.S.C. §3732(b),
7 | inasmuch as recovery is sought on behalf of said states which arises from the same transactions
8 | and occurrences as the claim brought on behalf of the United States. Moreover, Defendants
9 | transact business in said states.

10 |  6.  Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because
11 | Defendants transact business in this District, and in fact, a substantial amount of false claims that
12 | are described in this Complaint occurred in the Northern District of California.

13 |  7.  The facts and circumstances which give rise to Defendants' violations of the False
14 | Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor
15 | in any congressional, administrative, or General Accounting Office report, hearing, audit, or
16 | investigation, nor in the news media.

17 |  8.  Relator is the original source of the information upon which this complaint is
18 | based, as that phrase is used in the False Claims Act and other laws at issue herein.

19 |  9.  Defendant  MALLINCKRODT  INC.,  (hereinafter  referred  to  as
20 | MALLINCKRODT) is a Delaware corporation with its principal place of business located in
21 | Hazelwood, MO. From 2000 until 2007, it was a business unit of Tyco Healthcare, Group, L.P.,
22 | a subsidiary of Tyco International, Ltd. In July 2007, Tyco International spun off into three
23 | separate companies: Tyco International, Tyco Electronics, and Covidien. With the split in 2007,
24 | said Defendant became a subsidiary of Covidien, Ltd. (U.S.), whose headquarters are located in
25 | Mansfield, MA.

26 |  10.  Defendant, COVIDIEN INC., f/k/a Tyco Healthcare Group, whose headquarters
27 | is in Mansfield, MA., has at all material times full knowledge and participation in the actions
28 | which give rise to False Claims Act liability alleged herein. Covidien Inc., is the U.S. affiliate of

1    Covidien Ltd., a foreign corporation. Covidien's principal place of business in the United States

2    is in the state of Massachusetts. Its international headquarters is located at 90 Pitts Bay Road, 2nd

3    floor, Pembroke, HM 08, Bermuda. As of July 2007, Covidien is successor in interest to Tyco

4    Healthcare Group LP.  Tyco Healthcare Group LP was a limited partnership formed under the

5    laws of Delaware, and its principal place of business is in Mansfield, Massachusetts. Mallinckrodt

6    Inc., was a limited partner of Tyco Healthcare Group LP.

7        11.    Defendant, TYCO INTERNATIONAL (US), Inc., is a Nevada Corporation with

8    its principal place of business at 9 Roszel Road, Princeton, New Jersey. Through July 2007, it has

9    had at all material times full knowledge and participation in the actions which give rise to False

10   Claims Act liability alleged herein. It was the parent company of Tyco Healthcare Group LP.

11       12.    Relator, JOHN PRIEVE, is a resident of the State of Illinois, and is currently

12   employed by Defendant as a District Manager in the Defendant MALLINCKRODT Brand

13   Pharma Division.

14       13.    MALLINCKRODT's "Brand Pharma" division currently sells the following drugs:

15   Restoril, Tofranil PM, Magnacet, Anafronil, Depade, Methadose and Pamelor. Only Restoril,

16   Tofranil PM and Magnacet are actively promoted by the sales representatives, and are the subject

17   of this lawsuit.

18       14.    Relator brings this action based on his direct knowledge and, where indicated, on

19   information and belief. None of the actionable allegations set forth in this Complaint are based

20   on a public disclosure as set forth in 31 U.S.C. §3730(e)(4), and Relator is an original source of

21   the facts alleged in this Complaint.

22       15.    At all times relevant hereto, Defendants acted through their agents and employees,

23   and the acts of Defendants' agents and employees were within the scope of their agency and

24   employment. The policies and practices alleged in this complaint were, on information and belief,

25   established and/or ratified at the highest corporate levels of Defendants.

26                              THE DRUGS

27       16.    The conduct alleged in this lawsuit applies to three drugs caused to be and/or

28   actually marketed by the Defendants, as follows:

1       a.     Tofranil-PM (imipramine pamoate) capsules are FDA labeled as "indicated for

2 the relief of symptoms of depression. Endogenous depression is more likely to be alleviated than

3 other depressive states." The original NDA (017090) was approved on March 11, 1973.

4       b.     MALLINCKRODT obtained an ANDA for a generic version of Tofranil-PM in

5 2006. It then began promoting both the generic and brand versions. Even though it was "generic,"

6 it was the only generic and therefore it was priced merely 10% less than the brand version. It

7 included a Black Box warning regarding the increased risk of suicidality in children (as do all

8 antidepressants).

9       c.     Tofranil is a tricyclic antidepressant. Tricyclic antidepressant are a class of

10 antidepressant drugs first used in the 1950s. In the past decade, the prescription of selective

11 serotonin reuptake inhibitors (SSRIs) for the treatment of depression has far surpassed that of

12 TCAs. However, TCAs remain second only to analgesics as the most common drugs implicated

13 in overdose fatalities. Some evidence suggests that TCAs are associated with more overdose

14 fatalities per number of prescriptions issued than other antidepressant classes. (Samara Soghoian,

15 M.D. "Toxicity, Tricyclic Antidepressant," retrieved on 3/25/08 at www.emedicine.com).

16       17.     Restoril (temazepam) capsules FDA label states that it is indicated:

17          . . . for the short-term treatment of insomnia (generally 7-10 days).
For patients with short-term insomnia, instructions in the
18          prescription should indicate that Restoril® (temazepam) should be
used for short periods of time (7-10 days). The clinical trials
19          performed in support of efficacy were 2 weeks in duration with the
final formal assessment of sleep latency performed at the end of
20          treatment.

21       a.     Restoril 7.5MG, 15MG, and 30MG.were approved by the FDA on February 27,

22 1981. Four companies are approved for therapeutic equivalence for the 15MG and 30MG

23 capsule. The 7.5 mg capsule has patent protection through 2010. In addition a 22.5mg strength

24 was FDA-approved in November 2004, and launched by MALLINCKRODT in early 2005.

25       b.     MALLINCKRODT has promoted the 7.5mg and 22.5mg doses only, because it

26 has no competition for those doses. MALLINCKRODT has marketed the 7.5mg dose by

27 producing a study that purportedly showed that the 7.5mg had efficacy equal to the 15mg dose

28 and therefore the 7.5mg was an appropriate lowest effective dose for temazepam (because side

1    effects would be lower). MALLINCKRODT promoted the 22.5mg dose over the 30mg dose with

2    the same study, by employing a "dose-response" curve analogy. The promoted doses had no

3    competition while the un-promoted doses did.

4         c.    Restoril (temazepan) is a Schedule IV controlled substance. Medical literature

5    references its high abuse potential.

6         18.    Magnacet™ (oxycodone/acetaminophen) capsules are available in 2.5\400, 5/400,

7    and 7.5/400, and 10/400 MG strengths. All acetaminophen/oxycodone products, are indicated

8    "for the relief of moderate to moderately severe pain." Although not detailed herein, the

9    marketing practices attributable to Tofranil-PM and Restoril as it related to kickbacks are also

10   applicable to Magnacet, since its FDA approval in March 2006.

11        19.    Medicaid reimbursement information concerning Tofranil-PM, generic imipramine

12   pamoate, and Restoril, is provided (in approximation) below:

| PRODUCT | TOTAL 2002 THRU 3RD QTR 2007 |
|---------|------------------------------|
| RESTORIL 22.5 MG | $358,309 |
| RESTORIL 7.5 MG | $25,377,775 |
|  | $25,736,084 |
| RESTORIL 15 MG | $204,450 |
| RESTORIL 30 MG | $743,583 |
|  | $948,033 |
| TOFRANIL PM 75MG CAPS | $7,946,224 |
| TOFRANIL PM 100MG CAPS | $1,947,575 |
| TOFRANIL PM 125MG CAPS | $221,243 |
| TOFRANIL PM 150MG | $2,077,910 |
|  | $12,192,952 |
| IMIPRAMINE PAMOATE | $1,087,249 |
| IMIPRAMINE PAMOATE | $327,141 |
| IMIPRAMINE PAMOATE | $20,343 |
| IMIPRAMINE PAMOATE | $212,385 |
|  | $1,647,118 |
| TOTAL | $40,524,187 |

27        20.    Tofranil-PM and its generic are available under most Medicare Part D plans.

28   Restoril, as a benzodiazepine, is excluded from Medicare Part D coverage altogether.

THE REGULATORY ENVIRONMENT

21.    Pursuant to the Anti-Kickback Act, 42 U.S.C. Section 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE.

22.    The Anti-Kickback Act is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

23.    Every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of health care services in the United States.

24.    The Anti-Kickback Act prohibits suppliers such as pharmaceutical manufacturers from compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

25.    The Federal False Claims Act provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
> * * *
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729. A violation of the Anti-kickback Act is a violation of the False Claims Act.

26.    The United States Food, Drug and Cosmetic Act (FDCA) establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States, including the introduction of new drugs into interstate commerce. When the United States Food and Drug Administration ("FDA") approves a drug, it approves the drug only for the particular use for which it was tested, but after the drug is approved for a particular use, the FDCA does not regulate how the drug may be prescribed. Thus, a drug

1 that has been tested and approved for one use only can also be prescribed by a physician for
2 another use, known as an "off-label" use.

3     27.    While a physician may prescribe a drug for a use other than one for which it is
4 approved, the FDCA prohibits a drug manufacturer from *marketing or promoting* a drug for non-
5 approved uses. 21 U.S.C. § 331(d), 355(a). It therefore is illegal for a drug manufacturer and its
6 sales representatives to initiate discussions with medical professionals regarding any off-label use
7 of the drug.

8     28.    The dissemination of information or materials by a pharmaceutical manufacturer
9 of any unapproved or off-label use, also known as "misbranding," constitutes unlawful
10 promotional advertising of the drug and violates the FDCA.

11     29.    In addition to prohibiting manufacturers from directly marketing and promoting
12 a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from
13 employing indirect methods to accomplish the same end. For example, the FDA regulates two
14 of the most prevalent indirect promotional strategies: (A) manufacturer dissemination of medical
15 and scientific publications concerning the off-label uses of their products; and (B) manufacturer
16 support for Continuing Medical Education ("CME") programs that focus on off-label uses.

17     30.    With regard to the first practice—disseminating written information—the FDCA
18 allows a manufacturer to disseminate information regarding off-label usage only in response to
19 an "unsolicited request from a health care practitioner." 21 U.S.C. §360aaa-6 (emphasis added).
20 In any other circumstance, a manufacturer is permitted to disseminate information concerning the
21 off-label uses of a drug only after the manufacturer has submitted an application to the FDA
22 seeking approval of the drug for the off-label use; and has provided the materials to the FDA prior
23 to dissemination. The materials must be submitted in an unabridged form and must not be false
24 or misleading. 21 U.S.C. §§ 360aaa(b) & (c);360aaa-1.

25     31.    In sum, the off-label regulatory scheme protects patients and consumers by
26 ensuring that drug companies do not promote drugs for uses other than those found to be safe and
27 effective by an independent, scientific governmental body—the FDA.

28     32.    Reasons why Congress made off-label marketing and promotion by drug

1   manufacturers illegal include, without limitation, the following:

2        (a)    Off-label promotion diminishes or eliminates the drug manufacturer's incentive

3               to study the use of its drug and obtain defini'' safety and efficacy data;

4        (b)    Off-label promotion harms patients as the result of unstudied uses that lead to

5               adverse results, or are ineffective;

6        (c)    Off-label promotion diminishes the use of evidence-based medicine; and

7        (d)    Off-label promotion erodes the efficacy standard in medicine.

8                                    UNLAWFUL PROMOTION

9        33.    Without financial inducement to the providers, the majority of the prescriptions

10   for Defendants' drugs would absolutely not be prescribed.

11       34.    The illegal activity alleged herein was first communicated to Relator in a July 22,

12   2005 sales management meeting, likely in St. Louis, Mo.

13       35.    Management made it clear that it was looking for shady doctors that were "high

14   volume tricyclic antidepressant    and sleeper writers" who would be receptive to

15   MALLINCKRODT's "consulting" arrangements. Physicians with "good access" or "excellent

16   access" was a euphemism for physicians who would be receptive to prescribing Defendants'

17   products.

18                    KICKBACKS - FIELD MARKETING SPECIALIST PROGRAM

19       Introduction

20       36.    As Tofranil-PM and Restoril were considered out-dated, third-rate drugs, it took

21   kickbacks to effectuate prescription sales, and MALLINCKRODT implemented its kickbacks,

22   in 2005, through the Field Marketing Specialist Program ("FMSP"). The FMSP program was

23   designed to recruit physicians with high prescription volume in the sleep hypnotic, depression or

24   pain markets, through monetary inducements. The Field Marketing Specialists (FMS's) were

25   brought in to assist the sales representatives to obtain physicians as "consultants."

26       37.    Physicians were targeted as "consultants" based upon (1) the volume of tricyclic

27   antidepressant and/or sleeper medications they typically wrote; (2) and the extent to which they

28   were *willing* to be a "consultant."

1    38.    Whether or not MALLINCKRODT would hire a "consultant" was primarily

2  determined by whether or not the "consultant" was willing to "play ball" by prescribing its 20-30

3  year old drugs in higher volumes. It was made clear to potential physician consultants during the

4  initial meeting with the FMS, that MALLINCKRODT was looking for 50-60 prescriptions a

5  month of their products while employed as a "consultant" doing "data collection or other

6  projects."

7    Foundation of the Kickbacks : The Consulting Agreements

8    39.    The vehicle to pay the providers were based upon consulting arrangements set

9  forth in two Consulting Agreements, each implemented at different times. The 2005 Consulting

10  Agreement, was the main vehicle to implement the kickbacks.  The entire Agreement is boiler

11  plate and could almost apply to any consultant for any business. The fourth paragraph of page 1,

12  entitled "Compensation," provides:

13    ... Mallinckrodt will pay Consultant at the rate of $250 per hour which shall
     be paid to consultant within 45 days of receipt of Consultant's invoice and

14    Consultant shall bill Mallinckrodt in 1/4 hour increments and provide
     Mallinckrodt with detailed time entries describing work performed...

15

16    40.    Consultants were paid upon the submission of a form invoice prepared by

17  MALLINCKRODT.

18    41.    Doctors were referred to on internal spreadsheets as "sales consultants" or

19  "marketing consultants." Typically a "sales consultant" was a speaker, or at least would be paid

20  honorariums as a speaker out of the District-level budget. A "marketing consultant," on the other

21  hand, was paid from the home office marketing budget and typically was paid for other purported

22  reasons in addition to speaker fees.

23    Kickback Programs

24    Trials

25    42.    MALLINCKRODT set up "clinical trials" for their decades old drugs, solely for

26  the purpose of generating sales. Unlike legitimate clinical trials: (1) The "clinical trials" were

27  placed and managed by the MALLINCKRODT's sales force, not any research division; (2) Sales

28  representatives would help a physician fill out the "clinical trial" forms; (3) Internal e-mails

1   outwardly admit that their primary role was to generate sales for the sales force, not produce
2   legitimate results which could be used for research on their products.

3       43.     Providers were recruited from *any* specialty, and the goal was to get the targeted
4   physician to agree to convert or start a certain number of patients from his/her practice, on either
5   Restoril, Tofranil-PM, (or later, Magnacet). The number of patients mutually agreed as
6   "necessary" for the clinical trial was usually in the range of 50-60 per month. The physician
7   consultant, was compensated at a rate of $250.00 per hour for their time spent to convert or
8   initiate therapy on one of MALLINCKRODT's drugs from the physician's patient pool.

9       44.     The "consultant" was paid by billing MALLINCKRODT using a simple form
10  invoice that was prepared by MALLINCKRODT and often completed by MALLINCKRODT's
11  employees. Some physicians were set up for the mutually agreed number of hours per month for
12  their consultantships, which were to continue as long as the patient volume on
13  MALLINCKRODT's products remained at a certain level. The "studies" were not even remotely
14  scientific. Since only the sales force was involved with the data, there were no designs, protocol
15  or anything that is ordinarily used in a clinical trial. In fact, the Mallinckrodt Brand Pharma
16  division consists only of marketing, sales, sales operations and training, and business development
17  departments. There is no research and development department in the division. Feedback was
18  given to the FMS through either a dinner meeting (for which the consultant was again paid) or
19  other informal method, usually just mailed to the FMS by the physician with no actual verification
20  of time worked for the month.

21                          Speaker Programs

22      45.     Another way to put money in a physician's pocket was to have him be a
23  "consultant" *speaker*. For the consultants to perform speaker programs, there were neither slide
24  sets nor training provided. The speaker programs consisted simply of a small number of
25  physicians invited to a lunch/dinner, typically with known physician acquaintances or from whom
26  the speaker received referrals, to discuss the "consultant's" experience with the product(s).

27                          Preceptorships

28      46.     Preceptorships were ostensibly a teaching session in which a physician would teach

FIRST AMENDED FALSE CLAIMS ACT COMPLAINT
- 11 -

1  the FMS certain technical aspects of his practice, in exchange for the sum of $ 250/per hour. In

2  actuality, preceptorships were used to provide monetary inducements to physicians. Although

3  MALLINCKRODT paid thousands of dollars to  physicians for preceptorships, the teaching

4  portion was almost never performed. Rather, it was simply another example of paid access to the

5  physician by the FMS in order to facilitate a sales presentation opportunity of

6  MALLINCKRODT's products. The FMS would typically use the time to provide clear and direct

7  feedback regarding the physician's prescription performance. Preceptorships were sometimes

8  repeated with the same physicians several times over and over.  MALLINCKRODT issued 1099s

9  to each physician who received these type of payments.

10      47.    In contrast to a pharmaceutical company that does not illegally use preceptorships

11  as kickbacks, MALLINCKRODT's FMS team: (1) did not need manager approval to conduct

12  preceptorships; (2) could perform unlimited preceptorships, including multiple times within the

13  same physician group or physician; (3) could pay $250/hour to the physician and spend as much

14  or little time with the physician as they wanted; (4) almost always used preceptorships for reasons

15  other than educational purposes, e.g. to get to know the physician, pay-off the physician, or make

16  up for some loss that a physician incurred.

17              Advisory Panel Meetings

18      48.    These meetings were for the ostensible purpose of getting input/feedback from

19  physicians on drug performance, how they treat disease states, etc., although internal e-mails

20  clearly admit otherwise. During the Advisory Panel meetings, honorariums, lavish entertainment

21  and expenses for physicians were paid for by MALLINCKRODT.

22      49.    Advisory Panels were utilized not only to pay-off prescribing physicians, they were

23  also utilized to get feedback from the physicians for how to market Tofranil-PM to other

24  physicians. Indeed, the MALLINCKRODT was transparent, by referring to the meetings as "TPM

25  *message* research programs." Physicians, nevertheless,  would not be invited unless they were

26  high prescribers.

27              Phony Paperwork Programs

28      50.    These programs were designed to induce physicians to prescribe

1  MALLINCKRODT's products, in exchange for money and the intent to do so is fairly obvious
2  from the documentation in relator's possession.

3      51.     The Pharmacy Call Back program involved telling the physician to fill out one line
4  in the Pharmacy Call Back form when therapy was initiated with MALLINCKRODT's product.
5  If a pharmacist was calling regarding a particular prescription that the physician wrote, the
6  physician was to write down what the pharmacist said e.g. "Dr. may I switch this to generic?"
7  Every line filled out on the Pharmacy Call Back Form was worth about 15 minutes to the doctor.
8  If the doctor filled up 4 lines of prescription call-backs, for instance, the physician received $250
9  for an hour's worth of work.

10      52.     The physician's duties for Managed Care Plans were analogous to the Pharmacy
11  Call Back. If the physician was called by the pharmacist from a managed care plan regarding
12  MALLINCKRODT's drugs, (and therefore the MALLINCKRODT's drugs were covered by the
13  managed care plan), the physician was paid, per line. Every 4 lines were worth $250, for an hour
14  of the physician's time.

15      Termination of the FMS Program and Conversion to Speaker Programs Only.

16      53.     The FMS program was discontinued on September 30, 2007, and the consultant's
17  role was to changed to speaking programs only. In other words, providers could receive payment
18  from MALLINCKRODT as a "consultant" only for participating in speaker programs. With the
19  sudden termination of the FMS program, which had a variety of ways to pay a physician, planning
20  for the transition to the MDS program, only, was non-existent, and therefore sales temporarily
21  suffered (because kickbacks decreased temporarily).

22      54.     With the termination of the FMS program, the 2005 Consulting Agreement was
23  modified. The compensation provision in the new, 2007 Consulting Agreement, now tailored only
24  to speaking engagements, and provided only for a flat fee:

25              ... Mallinckrodt will pay Consultant an Honorarium at the rate of $1500 per
                standard event... a standard event is any speaking engagement or peer-to-peer
26              education event that occurs after standard business hours (9-5, Monday through
                Friday) and within 100miles of Consultant's place of business. For events
27              occurring during business hours within 100 miles of Consultant's place of
                business the rate will be 2/3 of the standard event rate or . .. $1,000. For events
28              more than 100 miles from Consultant's place of business, regardless of time,

the rate will be 2 times the standard rate or $3,000 to compensate the Consultant for additional time involved with traveling but not limited to expenses (see below), though if multiple events are planned in one extended trip, only the first will be paid at the higher rate for travel while additional events during the same contiguous trip will be paid at the appropriate rate for the event as if it was within 100 miles of the consultant's place of business. Any expenses associated with events that are incurred by the Consultant should be approved in advance and billed and paid separately from Compensation described herein. In the event that the Consultant is requested to provide assistance to Mallinckrodt on an hourly basis on a specific project, then the rate for such hourly work will be $250 per hour.

55.     After September 30, 2007, Relator believes that the kickbacks have continued at the same levels, but they have largely been paid through speaking engagements.

## OTHER VIOLATIONS

Off-label Tofranil-PM

56.     Defendants were well aware that its sales force was marketing Tofranil (or its generic, imipramine pamoate - IP) for off-label use, as they were directed to do so. From the beginning of training, the sales force was prepped on the off-label uses of tricyclic antidepressants.

57.     Tofranil-PM was promoted off-label, in order of prescription prevalence, for pain (fibromyalgia, body pain and neuropathics), migraines, sleep, and enuresis/incontinence (the latter which involved some pediatrician prescribing).

58.     About 75% of all prescriptions of Tofranil-PM were written for these off-label uses. The targeted specialties called upon included: primary care physicians, neurologists, gastroenterologists, occupational medicine physicians, orthopedists, anaesthesiologists, urologists and rheumatologists. To help in their detailing, MALLINCKRODT made 2 reprints authored by John Zajecka, M.D. each having a paragraph referencing off-label uses of TCAs. These reprints were made available to sales representatives for distribution to physicians regardless of practice specialty.

59.     In order to successfully carry out the off-label promotion, MALLINCKRODT conducted national sales meetings, regional and district meetings, designed specifically for the purpose of training representatives on off-label sales and marketing practices.

1      60.    Indeed, Sales Representatives were trained on off-label marketing techniques such

2  as: (a) copying and distributing studies; (b) sales calls solely for the purpose of off-label selling;

3  (c) educating physicians on reimbursement/coding so that off-label claims would be covered for

4  their patients.

5      61.    Uniform and widespread tactics used by MALLINCKRODT to promote off-label,

6  in conjunction with kickbacks, included hiding behind "CME" Speaker Programs via physicians

7  and other healthcare providers to promote off-label usage. These programs were controlled and

8  promoted by MALLINCKRODT, and had little, if anything, to do with the advertised content of

9  the program.

10     62.    As a result of these tactics, when physicians and pharmacies and possibly other

11  healthcare providers expressly certified, as a precondition to payment, that they would comply

12  with the terms set out on Form HCFA-1500 (which includes language that the services were

13  "medically indicated and necessary for the health of the patient") and other claims for payment,

14  the claims they submitted were false because the drugs were neither medically indicated and

15  necessary, for the off-label uses, under Government Healthcare Programs, as explained below.

16

Claims Submitted to Government Healthcare Programs Were Not Covered

17

18     63.    Although states may pay for any drug for any indication, they must do so without

(Federal Financial Participation) FFP if the drug, as prescribed, is not for a medically acceptable

19  use. FFP is available to states only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10).

20  "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is

21  not a medically accepted indication." Id. § 1396r-8(k)(3). A medically accepted indication is

22  defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" ("FDCA")

23  or which is "supported by one or more citations included or approved for inclusion" in specified

24  drug compendia. Id. § 1396r-8(k)(6). 42 U.S.C.§ 1396r-8(g)(1)(B)(I) identifies the compendia

25  to be consulted: American Hospital Formulary Service Drug Information; United States

26  Pharmacopeia-Drug Information; and the DRUGDEX Information System. The compendia will

27  hereinafter be referred to collectively as "the Drug Compendia."

28

1      64.    When pharmacies, physicians and other healthcare providers submitted claims

2  based upon a physician's prescription for Tofranil-PM for off-label uses, the claims they

3  submitted were false because such off-label uses were not supported by a citation in one of the

4  Drug Compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(I).

5      65.    Medicare Part A is funded primarily by a federal payroll tax, premiums paid by

6  Medicare beneficiaries and appropriations from Congress. Medicare Part A generally pays for

7  inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as

8  well as some home healthcare services. 42 U.S.C. §§1395e - 42 U.S.C. §§1395i-5. Prescription

9  drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a

10  hospital or similar setting.

11      66.    Medicare Part B is optional to beneficiaries and covers some healthcare benefits

12  not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and

13  premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C.

14  §§1395j - 42 U.S.C. §§1395w-4. Medicare Part B pays for some types of prescription drugs that

15  are not administered in a hospital setting. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42

16  C.F.R. §405.517.  These typically include drugs administered by a physician or other provider

17  in an outpatient setting, some orally administered anti-cancer drugs and antiemetics (drugs which

18  control the side effects caused by chemotherapy), and drugs administered through durable medical

19  equipment such as a nebulizer.  42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R.

20  §405.517.

21      67.    On January 1, 2006, Part D of the Medicare program began providing drug

22  coverage for all beneficiaries.  The drug benefit covers all drugs that are considered "covered

23  outpatient drugs" under 42 U.S.C. §1396r-8(k). The off-label uses discussed herein are not

24  supported by "clinical research that appears in peer-reviewed medical literature," and could not,

25  under any circumstances, be determined to be "medically accepted generally as safe and effective"

26  for such uses.

27      68.    In addition to Medicaid and Medicare, the federal government reimburses a portion

28  of the cost of prescription drugs under several other federal health care programs, including but

1     not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit
2     Program.

3           69.     The off-label uses of Tofranil-PM promoted by MALLINCKRODT were not
4     eligible for reimbursement under any of the various federal health care programs. Coverage of
5     off-label drug use under these programs is similar to coverage under the Medicaid program. See,
6     e.g., TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002);
7     CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

8           70.     Defendants were aware that the natural and probable consequence of its promotion
9     of off-label uses of Tofranil-PM was that health care providers would submit claims for payment
10    to these and other government payors for the off-label use.

11          71.     Notwithstanding this knowledge, Defendants illegally, vigorously, and without any
12    thought to the possible negative health effects to which it subjected patients, promoted off-label
13    uses of Tofranil-PM. Defendants were aware that its illegal promotion did in fact result in false
14    claims to these and other government payors for the off-label use. Defendants were aware that
15    its promotional activities were a substantial factor in producing the claims.

16          72.     False claims to these government healthcare programs for off-label prescribing of
17    Tofranil-PM was the direct and proximate result of unlawful off-label marketing efforts by
18    Defendants. Defendants caused the submission of these claims.

19          73.     Defendants caused the submission of false claims, since healthcare providers
20    submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Healthcare Programs,
21    and the states submitted Form CMS-64 to the Federal Government, all claiming reimbursement
22    for Tofranil-PM for such off-label uses.

23          Pricing Violations

24          74.     Pharmaceutical manufacturers participating in Medicaid programs must rebate to
25    the states, a certain statutorily-prescribed portion of the price of drugs purchased by each
26    Medicaid program in each state. See 42 U.S.C. §1396r-8(a)(1). Manufacturers do this because
27    the Medicaid statute, 42 U.S.C. §§1396a-u, permits the federal government to partially reimburse
28    states only for drugs purchased from manufacturers who have agreed to pay statutorily specified

1   rebates to those states. See 42 U.S.C. §1396r-8. Thus, pharmaceutical manufacturers that want
2   their drugs available to Medicaid beneficiaries under the Medicaid program enter into a Rebate
3   Agreement with the Department of Health and Human Services ("HHS") Secretary to provide
4   rebates. See 42 U.S.C. §1396r-8(a)(1).

5       75.   The Rebate Agreement requires manufacturers to submit a Quarterly Report (Form
6   CMS-367). The Quarterly Report includes information regarding each of the manufacturers'
7   "Covered" Drugs, including such information as its "Average Manufacturer Price" ("AMP"),
8   "Baseline AMP," and its "Best Price." Based upon this information, HHS, through its component
9   agency, The Centers for Medicare & Medicaid Services ("CMS"), then tells the states how much
10  rebate the state is entitled to collect with respect to each drug.

11      76.   MALLINCKRODT entered into a Rebate Agreement with HHS.   In that
12  Agreement, Defendant agreed to comply with 42 U.S.C. §1396r-8, and hence:

13          a.   Agreed to report its Best Price, inclusive of cash discounts, free goods
14  contingent upon any purchase requirements, volume discounts and rebates, etc.

15          b.   Agreed that it would determine its Best Price based upon its AMP,
16  calculated as "net sales divided by numbers of units sold, excluding free goods (i.e., drugs or any
17  other items given away, but not contingent on any purchase requirements)" and that it would
18  include that in the calculation, cash discounts and all other price reductions "which reduce the
19  actual price paid"; and

20          c.   Agreed that the Best Price would not take into account nominal prices,
21  defined as prices that are less than 10 percent of the AMP in that quarter, so long as the sale of
22  product at a nominal price was not contingent on any other sale.

23      77.   After execution of this Agreement, MALLINCKRODT reported its AMP and/or
24  Best Price in each quarter, to the Medicaid Program on an electronic form of Form CMS-367.

25      78.   In the instant case, MALLINCKRODT failed to take into account the Kickbacks
26  it paid as well as free goods, volume discounts, rebates, etc., when reporting its Best Price.

27      79.   As a result, MALLINCKRODT's Best Price, for quarterly reports submitted for
28  at least the past 6 years, were inflated, which reduced the percentage difference between AMP and

1  Best Price, thereby reducing the rebate amount that MALLINCKRODT ultimately paid to each
2  state Medicaid program. MALLINCKRODT artificially inflated its Best Price, by calculating its
3  Best Price without taking into account its inducement activities, which reduced the true cost of
4  its drugs. MALLINCKRODT did not take into account all of the inducements described in this
5  Complaint, such as phony drug trials, phony speaker fees, phony preceptorships, phony speaker
6  meetings, phony advisory panel meetings, and all other inducements described herein.

7        80.     MALLINCKRODT knowingly set and reported its Best Price for these drugs at
8  levels far higher than the actual Best Price, in Form CMS-367, submitted quarterly to CMS for
9  at least the past 6 years. By doing so, MALLINCKRODT has violated the Federal (and applicable
10  state) False Claims Acts, by knowingly making, using, or causing to be made or used, a false
11  record to conceal, avoid, or decrease an obligation to pay or transmit money to federal and state
12  governments.

13       81.     Under the Veterans Health Care Act of 1992 ("VHCA"), drug manufacturers are
14  required to enter a pricing agreement with the Secretary of HHS for the section 340B Drug Pricing
15  Program, and with the Department of Veterans Affairs (VA) and other Department of Defense
16  programs.

17       82.     Once a labeler/manufacturer enters into such a pricing agreement, its drugs are
18  listed on the Federal Supply Schedule ("FSS"), a price list containing over twenty-thousand
19  pharmaceutical products. The VA and other Government Programs depend on the FSS for most
20  of its drug purchases, with the exception of several national contracts awarded for specific drugs
21  considered to be therapeutically interchangeable.

22       83.     Under the VHCA, drug manufacturers must comply with 38 U.S.C. § 8126.
23  Subsection (a)(2) requires that "the price charged during the one-year period beginning on the date
24  on which the agreement takes effect may not exceed 76 percent of the non-Federal average
25  manufacturer price (less the amount of any additional discount required under subsection (c)) ...."

26       84.     In the instant case, MALLINCKRODT failed to take into account its inducements
27  when reporting the non-Federal average manufacturer price. MALLINCKRODT therefore
28  violated 38 U.S.C. §8126 causing damage to the VA program, and by not giving its best price as

1  set forth in subsection (a)(2), MALLINCKRODT became ineligible for Medicare and other

2  federal program reimbursement.

3                                      CONCLUSION

4         85.    The decision-making of the physician, that important element in Government

5  Program coverage policy was completely undermined by the Defendants' unlawful marketing.

6  The physicians prescribing Tofranil-PM (brand and generic) and Restoril did not necessarily do

7  so because they believed, based on their review of peer-reviewed medical literature, or discussions

8  with their colleagues, that the drugs would help their patients; rather the drugs were often

9  prescribed because the physicians were actively pursued with kickbacks.

10                              COUNT 1—FALSE CLAIMS ACT

11        86.    Relator realleges and incorporate by reference paragraphs 1 -86 as though fully set

12  forth herein.

13        87.    This is a claim by Relator, on behalf of the United States, for treble damages and

14  penalties under the False Claims Act, 31 U.S.C. 3729-3733 against Defendants for knowingly

15  causing to be presented false claims to Government Healthcare Programs. From on or about

16  January 2002 through present, in the Northern District of California and elsewhere throughout the

17  United States, Defendants have knowingly and willfully violated the False Claims Act by

18  submitting and causing false claims to be submitted.

19        88.    Defendants have knowingly caused pharmacies and other healthcare providers to

20  submit Pharmacy, CMS-1500, and other claim forms for payment, knowing that such false claims

21  would be submitted to state Government Healthcare Programs for reimbursement, and knowing

22  that such Government Healthcare Programs were unaware that they were reimbursing

23  prescriptions for prescriptions induced by kickbacks and/or for non-covered uses and therefore

24  false claims. By virtue of the acts described in this Complaint, Defendants have knowingly

25  presented or caused to be presented, false or fraudulent claims to the United States Government

26  for payment or approval, in violation of 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(2).

27        89.    For Tofranil-PM in particular, Defendants also knowingly made, used, or caused

28  to be made or used false records and/or statements to get false or fraudulent claims paid or

1 approved by the Government. Each prescription that was written as a result of Defendants' illegal

2 marketing practices and illegal kickbacks represents a false or fraudulent record or statement.

3       90.     Defendants have violated 31 U.S.C. §3729(a)(2) by causing the states to submit

4 false claims to the United States Government in Form CMS-64 (Quarterly Medicaid Statement

5 of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for

6 which federal reimbursement was sought, including Tofranil-PM, were paid for in compliance

7 with federal law. States submitted false claims to the United States Government because when

8 Tofranil-PM was prescribed off-label, it was not prescribed for a medically accepted indication,

9 yet states sought reimbursement from the United States Government for all Tofranil-PM

10 expenditures.

11       91.     Defendants caused false claims to be submitted, resulting in Government Program

12 reimbursement to healthcare providers in the millions of dollars, in violation of the False Claims

13 Act, 31 U.S.C. §3729 et. seq. and the Anti-Kickback Act 42 U.S.C. §1320a-7b(b)(2)(A).

14       92.     The United States is entitled to three times the amount by which it was damaged,

15 to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than

16 $11,000.00 for each false claim presented or caused to be presented.

17     WHEREFORE, Relator respectfully requests this Court enter judgment against

18 Defendants, as follows:

19     (a)     That the United States be awarded damages in the amount of three times the
damages sustained by the U.S. because of the false claims alleged within this
20           Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq.
provides;

21
    (b)     That civil penalties of $11,000 be imposed for each and every false claim that
22           Defendants caused to be presented to the Government Healthcare Programs under
the Federal False Claims Act;

23
    (c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys'
24           fees, costs, and expenses which the Relator necessarily incurred in bringing and
pressing this case;

25
    (d)     That the Relator be awarded the maximum amount allowed pursuant to the
26           Federal False Claims Act; and

27     (e)     That the Court award such other and further relief as it deems proper.

28

1    COUNT II
2    ILLINOIS WHISTLEBLOWER REWARD & PROTECTION ACT

3    93.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through
4    86 above as if fully set forth herein.

5    94.    This is a *qui tam* action brought by RELATOR on behalf of the State of Illinois
6    to recover treble damages and civil penalties under the Illinois Whistleblower Reward and
7    Protection Act, 740 ILCS 175 *et seq.*

8    740 ILCS 175/3(a) provides liability for any person who:

9    (1)    knowingly presents, or causes to be presented, to an officer
or employee of the State of a member of the Guard a false or
10    fraudulent claim for payment or approval;
    (2)    knowingly makes, uses, or causes to be made or used, a
11    false record or statement to get a false or fraudulent claim paid or
approved by the State;
12    (3)    conspires to defraud the State by getting a false or
fraudulent claim allowed or paid.
13

14    95.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud
15    and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback,
16    bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing
17    any item or service for which payment may be made in whole or in part under the Illinois
18    Medicaid program.

19    96.    Defendants violated 305 ILCS 5/8A-3(b) by engaging in the conduct described
20    herein.

21    97.    Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused
22    hundreds of thousands of false claims to be made, used and presented to the State of Illinois by
23    its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-
24    Kickback Act, and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that
25    none of the claims submitted in connection with its conduct were even eligible for reimbursement
26    by the government-funded healthcare programs.

27    98.    The State of Illinois, by and through the Illinois Medicaid program and other state
28    healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

1 healthcare providers and third party payers in connection therewith.

2     99.    Compliance with applicable Medicare, Medicaid and the various other federal and

3 state laws cited herein was an implied, and upon information and belief, also an express condition

4 of payment of claims submitted to the State of Illinois in connection with Defendants' conduct.

5 Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an

6 express condition of payment of claims submitted to the State of Illinois.

7     100.    Had the State of Illinois known that Defendants were violating the federal and state

8 laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed

9 to meet the reimbursement criteria of the government-funded healthcare programs or were

10 premised on false and/or misleading information, it would not have paid the claims submitted by

11 healthcare providers and third party payers in connection with that conduct.

12     101.    As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois

13 has been damaged in an amount far in excess of millions of dollars exclusive of interest.

14     102.    Relator is a private citizen with direct and independent knowledge of the

15 allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on

16 behalf of himself and the State of Illinois.

17     103.    This Court is requested to accept pendant jurisdiction of this related state claim

18 as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

19 damages to the State of Illinois in the operation of its Medicaid program.

20     WHEREFORE, RELATOR respectfully requests this Court to award the following

21 damages to the following parties and against Defendants:

22 To the STATE OF ILLINOIS:
    (1)   Three times the amount of actual damages which the State of Illinois has
23          sustained as a result of Defendants' conduct;
    (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each
24          false claim which Defendants caused to be presented to the State of
         Illinois;
25     (3)   Prejudgment interest; and
    (4)   All costs incurred in bringing this action.
26
To RELATOR:
27
    (1)   The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any
28          other applicable provision of law;

1      (2)    Reimbursement for reasonable expenses which Relator incurred in
              connection with this action;
2      (3)    An award of reasonable attorneys' fees and costs; and
       (4)    Such further relief as this Court deems equitable and just.
3

4                                    COUNT III
                          CALIFORNIA FALSE CLAIMS ACT
5

6        104.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

7    86 above as if fully set forth herein.

8        105.    This is a *qui tam* action brought by RELATOR on behalf of the State of California

9    to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't.

10   Code § 12650 *et seq.*

11       106.    Cal. Gov't Code § 12651(a) provides liability for any person who

12              (1) knowingly presents, or causes to be presented, to an officer or
                employee of the state or of any political division thereof, a false
13              claim for payment or approval;
                (2) knowingly makes, uses, or causes to be made or used a false
14              record or statement to get a false claim paid or approved by the
                state or by any political subdivision;
15              (3) conspires to defraud the state or any political subdivision by
                getting a false claim allowed or paid by the state or by any political
16              subdivision.
                (4) is a beneficiary of an inadvertent submission of a false claim
17              to the state or a political subdivision, subsequently discovers the
                falsity of the claim, and fails to disclose the false claim to the state
18              or the political subdivision within a reasonable time after
                discovery of the false claim.
19

20       107.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal.

21   Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal

22   patients pursuant to Cal. Welf. & Inst. Code §14107.2.

23       108.    Defendants violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst.

24   Code § 14107.2 by engaging in the conduct described herein.

25       109.    Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly

26   caused hundreds of thousands of false claims to be made, used and presented to the State of

27   California by its deliberate and systematic violation of federal and state laws, including the

28   FDCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code § 650-650.1 and Cal. Welf. & Inst.

1 Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its

2 conduct were even eligible for reimbursement by the government funded healthcare programs.

3          110.    The State of California, by and through the California Medicaid program and other

4 state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

5 healthcare providers and third party payers in connection therewith.

6          111.    Compliance with applicable Medicare, Medi-Cal and the various other federal and

7 state laws cited herein was an implied, and upon information and belief: also an express condition

8 of payment of claims submitted to the State of California in connection with Defendants' conduct.

9 Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an

10 express condition of payment of claims submitted to the State of California.

11         112.    Had the State of California known that Defendants were violating the federal and

12 state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

13 failed to meet the reimbursement criteria of the government-funded healthcare programs or were

14 premised on false and/or misleading information, it would not have paid the claims submitted by

15 healthcare providers and third party payers in connection with that conduct.

16         113.    As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of

17 California has been damaged in an amount far in excess of millions of dollars exclusive of

18 interest.

19         114.    RELATOR is a private citizen with direct and independent knowledge of the

20 allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c)

21 on behalf of himself and the State of California.

22         115.    This Court is requested to accept pendant jurisdiction over this related state claim

23 as it is predicated upon the same exact facts as the federal claim, and merely asserts separate

24 damages to the State of California in the operation of its Medicaid program.

25         WHEREFORE, RELATOR respectfully requests this Court to award the following

26 damages to the following parties and against Defendants:

27         To the STATE OF CALIFORNIA:

28              (1)    Three times the amount of actual damages which the State of California
                       has sustained as a result of Defendants' conduct;

1         (2)   A civil penalty of up to $10,000 for each false claim which Defendants
            presented or caused to be presented to the State of California;

2         (3)   Prejudgment interest; and
      (4)   All costs incurred in bringing this action.

3

To RELATOR:

4

      (1)   The maximum amount allowed pursuant to Cal. Gov't Code § 12652

5               and/or any other applicable provision of law;
      (2)   Reimbursement for reasonable expenses which Relator incurred in

6               connection with this action;
      (3)   An award of reasonable attorneys' fees and costs; and

7         (4)   Such further relief as this Court deems equitable and just.

8

COUNT IV

9

FLORIDA FALSE CLAIMS ACT

10       116.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

11   86 above as if fully set forth herein.

12       117.   This is a *qui tam* action brought by RELATOR on behalf of the State of Florida

13   to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §

14   68.081 *et seq.*

15       118.   Fla. Stat. § 68.082(2) provides liability for any person who-

16

    (a) knowingly presents, or causes to be presented, to an officer or

17       employee of an agency a false or fraudulent claim for payment or
    approval;

18       (b) knowingly makes, uses, or causes to be made or used, a false
    record or statement to get a false or fraudulent claim paid or

19       approved by an agency;
    (c) conspires to submit a false claim to an agency or to deceive an

20       agency for the purpose of getting a false or fraudulent claim
    allowed-or paid.

21

    119.   In addition, Fla. Stat. § 409.920 makes it a crime to:

22

    (c) knowingly charge, solicit, accept, or receive anything of value,

23       other than an authorized copayment from a Medicaid recipient,
    from any source in addition to the amount legally payable for an

24       item or service provided to a Medicaid recipient under the
    Medicaid program or knowingly fail to credit the agency or its

25       fiscal agent for any payment received from a third-party source;

26                        * * *
    (e) knowingly, solicit, offer, pay or receive any remuneration,

27       including any kickback, bribe or rebate, directly or indirectly,
    overtly or covertly, in cash or in kind, in return for referring an

28       individual to a person for the furnishing of any item or service for
    which payment may be made, in whole or in part, under the

1       Medicaid program, or in return for obtaining, purchasing, leasing,
        ordering, or arranging, for or recommending, obtaining,
2       purchasing, leasing, or ordering any goods, facility, item, or
        service, for which payment may be made, in whole or in part,
3       under the Medicaid program.

4
        120.    Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt
5
        of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash
6
        or in kind, in exchange for referring or soliciting patients.
7
        121.    Defendants violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging
8
        in the conduct described herein.
9
        122.    Defendants furthermore violated Fla. Stat. § 68.082(2) and knowingly caused
10
        hundreds of thousands of false claims to be made, used and presented to the State of Florida by
11
        its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-
12
        Kickback Act, Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the fact that none
13
        of the claims submitted in connection with its conduct were even eligible for reimbursement by
14
        the government-funded healthcare programs.
15
        123.    The State of Florida, by and through the Florida Medicaid program and other state
16
        healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by
17
        healthcare providers and third party payers in connection therewith.
18
        124.    Compliance with applicable Medicare, Medicaid and the various other federal and
19
        state laws cited herein was an implied, and upon information and belief, also an express condition
20
        of payment of claims submitted to the State of Florida in connection with Defendants' conduct.
21
        Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was also an
22
        express condition of payment of claims submitted to the State of Florida.
23
        125.    Had the State of Florida known that Defendants were violating the federal and state
24
        laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed
25
        to meet the reimbursement criteria of the government-funded healthcare programs or were
26
        premised on false and/or misleading information, it would not have paid the claims submitted by
27
        healthcare providers and third party payers in connection with that conduct.
28
        126.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida

1   has been damaged in an amount far in excess of millions of dollars exclusive of interest.

2        127.   RELATOR is a private citizen with direct and independent knowledge of the

3   allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on

4   behalf of himself and the State of Florida.

5        128.   This Court is requested to accept pendant jurisdiction of this related state claim

6   as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

7   damages to the State of Florida in the operation of its Medicaid program.

8        WHEREFORE, RELATOR respectfully request this Court to award the following

9   damages to the following parties and against Defendants:

10       To the STATE OF FLORIDA:

11            (1)   Three times the amount of actual damages which the State of Florida has
                     sustained as a result of Defendants' conduct;
12            (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each
                     false claim which Defendants caused to be presented to the State of
13                  Florida
              (3)   Prejudgment interest; and
14            (4)   All costs incurred in bringing this action.

15       To RELATOR:

16            (1)   The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any
                     other applicable provision of law;
17            (2)   Reimbursement for reasonable expenses which Relator incurred in
                     connection with this action,
18            (3)   An award of reasonable attorneys' fees and costs; and
              (4)   Such further relief as this Court deems equitable and just.

19

20                                  COUNT V
                               TEXAS FALSE CLAIMS ACT

21       129.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

22   86 above as if fully set forth herein.

23       130.   This is a *qui tam* action brought by RELATOR on behalf of the State of Texas to

24   recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

25       131.   V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

26            (1) knowingly or intentionally makes or causes to be made a false
                  statement or misrepresentation of a material fact:
27                  (a) on an application for a contract, benefit, or
28                       payment under the Medicaid program; or

FIRST AMENDED FALSE CLAIMS ACT COMPLAINT
- 28 -

1                 (b) that is intended to be used to determine its
                 eligibility for a benefit or payment under the

2                  Medicaid program.

3           (2)   knowingly or intentionally concealing or failing to disclose
        an event:

4                  (a) that the person knows affects the initial or
                 continued right to a benefit or payment under the

5                  Medicaid program of.
                     (I)   the person, or

6                      (ii)  another person on whose
                 behalf the person has applied for a

7                  benefit or payment or is receiving a
                 benefit or payment; and

8                  (b) to permit a person to receive a benefit or
                 payment that is not authorized or that is greater

9                  than the payment or benefit that is authorized;

10           (4)   knowingly or intentionally makes, causes to be made,
        induces, or seeks to induce the making of a false statement or

11         misrepresentation of material fact concerning:
                 (b) information required to be provided by a federal

12                  or state law, rule, regulation, or provider agreement
                 pertaining to the Medicaid program;

13

14           (5)   knowingly or intentionally charges, solicits, accepts, or
        receives, in addition to an amount paid under the Medicaid
        program, a gift, money, a donation, or other consideration as a

15         condition to the provision of a service or continued service to a
        Medicaid recipient if the cost of the service provided to the

16         Medicaid recipient is paid for, in whole or in part, under the
        Medicaid program.

17

18         132.   Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused

19 hundreds of thousands of false claims to be made, used and presented to the State of Texas by

20 its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-

21 kickback Act and § 36.002, and by virtue of the fact that none of the claims submitted in

22 connection with its conduct were even eligible for reimbursement by the government-funded

23 healthcare programs.

24         133.   The State of Texas, by and through the Texas Medicaid program and other state

25 healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

26 healthcare providers and third party payers in connection therewith.

27         134.   Compliance with applicable Medicare, Medicaid and the various other federal and

28 state laws cited herein was an implied, and upon information and belief, also an express condition

1  of payment of claims submitted to the State of Texas in connection with Defendants' conduct.
2  Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an
3  express condition of payment of claims submitted to the State of Texas.

4          135.    Had the State of Texas known that Defendants were violating the federal and state
5  laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed
6  to meet the reimbursement criteria of the government-funded healthcare programs or were
7  premised on false and/or misleading information, it would not have paid the claims submitted by
8  healthcare providers and third party payers in connection with that conduct.

9          136.    As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the
10 State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of
11 interest.

12         137.    Defendants did not, within 30 days after it first obtained information as to such
13 violations, furnish such information to officials of the State responsible for investigating false
14 claims violations, did not otherwise fully cooperate with any investigation of the violations, and
15 have not otherwise furnished information to the State regarding the claims for reimbursement at
16 issue.

17         138.    RELATOR is a private citizen with direct and independent knowledge of the
18 allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code
19 § 36.101 on behalf of himself and the State of Texas.

20         139.    This Court is requested to accept pendant jurisdiction of this related state claim
21 as it is predicated upon the exact same facts as the federal claim, and merely asserts separate
22 damages to the State of Texas in the operation of its Medicaid program.

23         WHEREFORE, RELATOR respectfully requests this Court to award the following
24 damages to the following parties and against Defendants:

25         To the STATE OF TEXAS:

26              (1)    Two times the amount of actual damages which the State of Texas has
                       sustained as a result of Defendants' conduct;
27              (2)    A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum.. Res.
                       Code § 36.025(a)(3) for each false claim which Defendants cause to be
28                     presented to the state of Texas;

1         (3)   Prejudgment interest; and
          (4)   All costs incurred in bringing this action.

2

To RELATOR:

3

         (1)   The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code §

4                36.110, and/or any other applicable provision of law;
         (2)   Reimbursement for reasonable expenses which Relator incurred in

5                connection with this action;
         (3)   An award of reasonable attorneys' fees and costs; and

6          (4)   Such further relief as this Court deems equitable and just.

7

8

COUNT VI
MASSACHUSETTS FALSE CLAIMS ACT

9      140.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

10   86 above as if fully set forth herein.

11      141.   This is a *qui tam* action brought by RELATOR on behalf of the Commonwealth

12   of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass.

13   Gen. Laws Ann. Chap. 12 § 5(A) *et seq.*

14      142.   Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who-

15

16        (1)   knowingly presents, or causes to be presented, a false or
       fraudulent claim for payment or approval;
       (2)   knowingly makes, uses, or causes to be made or used, a

17      false record or statement to obtain payment or approval of a claim
       by the commonwealth or

18        (3)   conspires to defraud the commonwealth or any political
       subdivision thereof through the allowance or payment of a

19      fraudulent claim;
       (9)   is a beneficiary of an inadvertent submission of a false

20      claim to the common wealth or political subdivision thereof,
       subsequently discovers the falsity of the claim, and fails to disclose

21      the false claim to the commonwealth or political subdivision
       within a reasonable time after discovery of the false claim.

22

23      143.   In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation,

24   receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly,

25   overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which

26   payment may be made in whole or in part under the Massachusetts Medicaid program.

27      144.   Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging in the

28   conduct described herein.

145.    Defendants furthermore violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Mass. Gen. Law Ann. Chap. 118E § 41 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

146.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

147.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief: also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

148.    Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

149.    As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

150.    RELATOR is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

151.    This Court is requested to accept pendant jurisdiction of this related state claim

1   as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

2   damages to the Commonwealth of Massachusetts in the operation of its Medicaid program.

3           WHEREFORE, RELATOR respectfully requests this Court to award the following

4   damages to the following parties and against Defendants:

5
        To the Commonwealth OF MASSACHUSETTS:
6
            (1)   Three times the amount of actual damages which the Commonwealth of
7                 Massachusetts has sustained as a result of Defendants' conduct;
            (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each
8                 false claim which Defendants caused to be presented to the
                  Commonwealth of Massachusetts;
9           (3)   Prejudgment interest; and
            (4)   All costs incurred in bringing this action.
10
        To RELATOR:
11
            (1)   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap.
12                12, §5F and/or any other applicable provision of law;
            (2)   Reimbursement for reasonable expenses which Relator incurred in
13                connection with this action;
            (3)   An award of reasonable attorneys' fees and costs; and
14          (4)   Such further relief as this Court deems equitable and just.

15                                      COUNT VII
                               TENNESSEE FALSE CLAIMS ACT
16

17          152.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through
18
    86 above as if fully set forth herein.
19
            153.    This is a *qui tam* action brought by RELATOR on behalf of the State of Tennessee
20
    to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act,
21
    Tenn. Code Ann. § 71-5-181 *et seq.*
22
        § 71-5-182(a)(1) provides liability for any person who-
23
                  (A) presents, or causes to be presented to the state, a claim for
24                payment under the Medicaid program knowing such claim is false
                  or fraudulent;
25                (B) makes or uses, or causes to be made or used, a record or
                  statement to get a false or fraudulent claim under the Medicaid
26                program paid for or approved by the state knowing such record or
                  statement is false;
27                (C) conspires to defraud the State by getting a claim allowed or
                  paid under the Medicaid program knowing such claim is false or
28                fraudulent.

1    154.    Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused

2  hundreds of thousands of false claims to be made, used and presented to the State of Tennessee

3  by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-

4  Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its

5  conduct were even eligible for reimbursement by the government-funded healthcare programs.

6    155.    The State of Tennessee, by and through the Tennessee Medicaid program and other

7  state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

8  healthcare providers and third party payers in connection therewith.

9    156.    Compliance with applicable Medicare, Medicaid and the various other federal and

10  state laws cited herein was an implied, and upon information and belief, also an express condition

11  of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct.

12  Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an

13  express condition of payment of claims submitted to the State of Tennessee.

14    157.    Had the State of Tennessee known that Defendants were violating the federal and

15  state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

16  failed to meet the reimbursement criteria of the government-funded healthcare programs or were

17  premised on false and/or misleading information, it would not have paid the claims submitted by

18  healthcare providers and third party payers in connection with that conduct.

19    158.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the

20  State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive

21  of interest.

22    159.    RELATOR is a private citizen with direct and independent knowledge of the

23  allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-

24  183(a)(1) on behalf of himself and the State of Tennessee.

25    160.    This Court is requested to accept pendant jurisdiction of this related state claim

26  as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

27  damages to the State of Tennessee in the operation of its Medicaid program.

28

1        WHEREFORE, RELATOR respectfully requests this Court to award the following

2 damages to the following parties and against Defendants:

3

To the STATE OF TENNESSEE:

4

5           (1)   Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

6           (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

7           (3)   Prejudgment interest; and
          (4)   All costs incurred in bringing this action.

8

To RELATOR:

9

10           (1)   The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

11           (2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

12           (3)   An award of reasonable attorneys' fees and costs; and
          (4)   Such further relief as this Court deems equitable and just.

13

COUNT VIII
DELAWARE FALSE CLAIMS AND REPORTING ACT

14

15      161.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

16 86 above as if fully set forth herein.

17      162.   This is a *qui tam* action brought by RELATOR on behalf of the State of Delaware

18 to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act,

19 Title 6, Chapter 12 of the Delaware Code.

20      6 Del. C. § 1201(a) provides liability for any person who-

21           (1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or

22           fraudulent claim for payment or approval;
          (2) knowingly makes, uses, or causes to be made or used, directly

23           or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or

24           (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

25

26      163.   In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any

27 remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in

28 cash or in kind in return for the furnishing of any medical care or services for which payment may

1    be made in whole or in part under any public assistance program.

2       164.    Defendants violated 31 Del. C. § 1005 by engaging in the conduct described
3    herein.

4       165.    Defendants furthermore violated 6 Del. C. § 1201(a) and knowingly caused
5    hundreds of thousands of false claims to be made, used and presented to the State of Delaware
6    by its deliberate and systematic violation of federal and state laws, including the FDCA, the Anti-
7    Kickback Act, and 31 Del. C. § 1005 and by virtue of the fact that none of the claims submitted
8    in connection with its conduct were even eligible for reimbursement by the government-funded
9    healthcare programs.

10      166.    The State of Delaware, by and through the Delaware Medicaid program and other
11    state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by
12    healthcare providers and third party payers in connection therewith.

13      167.    Compliance with applicable Medicare, Medicaid and the various other federal and
14    state laws cited herein was an implied, and upon information and belief, also an express condition
15    of payment of claims submitted to the State of Delaware in connection with Defendants' conduct.
16    Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an
17    express condition of payment of claims submitted to the State of Delaware.

18      168.    Had the State of Delaware known that Defendants were violating the federal and
19    state laws cited herein and/or that the claims submitted in connection with Defendants' conduct
20    failed to meet the reimbursement criteria of the government-funded healthcare programs or were
21    premised on false and/or misleading information, it would not have paid the claims submitted by
22    healthcare providers and third party payers in connection with that conduct.

23      169.    As a result of Defendants' violations of 6 Del. C. § 1201(a), the State of Delaware
24    has been damaged in an amount far in excess of millions of dollars exclusive of interest.

25      170.    RELATOR is a private citizen with direct and independent knowledge of the
26    allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on
27    behalf of himself and the State of Delaware.

28      171.    This Court is requested to accept pendant jurisdiction of this related state claim

1   as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

2   damages to the State of Delaware in the operation of its Medicaid program.

3        WHEREFORE, RELATOR respectfully requests this Court to award the following

4   damages to the following parties and against Defendants:

5

To the STATE OF DELAWARE:

6

       (1)   Three times the amount of actual damages which the State of Delaware
7                 has sustained as a result of Defendants' conduct;
       (2)   A civil penalty of not less than $5,500 and not more than $11,000 for each
8                 false claim which Defendants caused to be presented to the State of
                 Delaware;
9       (3)   Prejudgment interest; and
       (4)   All costs incurred in bringing this action.
10

To RELATOR:

11

       (1)   The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any
12               other applicable provision of law;
       (2)   Reimbursement for reasonable expenses which Relator incurred in
13               connection with this action;
       (3)   An award of reasonable attorneys' fees and costs; and
14       (4)   Such further relief as this Court deems equitable and just.

15

16                           COUNT IX
                   NEVADA FALSE CLAIMS ACT

17

18     172.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

19   86 above as if fully set forth herein.

20     173.   This is a *qui tam* action brought by RELATOR on behalf of the State of Nevada

21   to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. §

22   357.010, *et. seq.*

23     174.   N.R.S. § 357.040(1) provides liability for any person who-

24          (a) knowingly presents or causes to be presented a false claim for
          payment or approval;
25          (b) knowingly makes or uses, or causes to be made or used, a false
          record or statement to obtain payment or approval of a false claim
26          (c) conspires to defraud by obtaining allowance or payment of a
          false claim;
27          (h) is a beneficiary of an inadvertent submission of a false claim
          and, after discovering the falsity of the claim, fails to disclose the
28          falsity to the state or political subdivision within a reasonable time.

1       175.    In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of

2   anything of value in connection with the provision of medical goods or services for which

3   payment may be made in whole or in part under the Nevada Medicaid program.

4       176.    Defendants violated N.R.S. § 422.560  by engaging in the conduct described

5   herein.

6       177.    Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused

7   hundreds of thousands of false claims to be made, used and presented to the State of Nevada by

8   its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-

9   Kickback Act and N.R.S. § 422.560, and by virtue of the fact that none of the claims submitted

10  in connection with its conduct were even eligible for reimbursement by the government-funded

11  healthcare programs.

12      178.    The State of Nevada, by and through the Nevada Medicaid program and other state

13  healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

14  healthcare providers and third party payers in connection therewith.

15      179.    Compliance with applicable Medicare, Medicaid and the various other federal and

16  state laws cited herein was an implied, and upon information and belief, also an express condition

17  of payment of claims submitted to the State of Nevada in connection with Defendant's conduct.

18  Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an

19  express condition of payment of claims submitted to the State of Nevada.

20      180.    Had the State of Nevada known that Defendants were violating the federal and

21  state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

22  failed to meet the reimbursement criteria of the government-funded healthcare programs or were

23  premised on false and/or misleading information, it would not have paid the claims submitted by

24  healthcare providers and third party payers in connection with that conduct.

25      181.    As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada

26  has been damaged in an amount far in excess of millions of dollars exclusive of interest.

27      182.    RELATOR is a private citizen with direct and independent knowledge of the

28  allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on

1  behalf of himself and the State of Nevada.

2  183. This Court is requested to accept pendant jurisdiction of this related state claim

3  as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

4  damages to the State of Nevada in the operation of its Medicaid program.

5  WHEREFORE, RELATOR respectfully requests this Court to award the following

6  damages to the following parties and against Defendants:

7

To the STATE OF NEVADA:

8
9       (1)   Three times the amount of actual damages which the State of Nevada has
              sustained as a result of Defendants' conduct;
        (2)   A civil penalty of not less than $2,000 and not more than $10,000 for each
10            false claim which Defendants caused to be presented to the State of
              Nevada;
11      (3)   Prejudgment interest; and
        (4)   All costs incurred in bringing this action..
12
To RELATOR:
13
14      (1)   The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any
              other applicable provision of law;
15      (2)   Reimbursement for reasonable expenses which Relator incurred in
              connection with this action;
        (3)   An award of reasonable attorneys' fees and costs; and
16      (4)   Such further relief as this Court deems equitable and just.

17
                                COUNT X
18       LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

19  184. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

20  86 above as if fully set forth herein.

21  185. This is a *qui tam* action brought by RELATOR on behalf of the State of Louisiana

22  to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs

23  Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

24  186. La. Rev. Stat. Ann. § 438.3 provides-

25
            (A) No person shall knowingly present or cause to be presented a
26          false or fraudulent claim;
            (B) No person shall knowingly engage in misrepresentation to
27          obtain, or attempt to obtain, payment from medical assistance
            program funds;
28          (C) No person shall conspire to defraud, or attempt to defraud, the

medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

187. In addition, La. Rev. Stat. Ann. § 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements. including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

188. Defendants violated La. Rev. Stat. Ann. § 438.2(A) by engaging in the conduct described herein.

189. Defendants furthermore violated La. Rev. Stat. Ann. §438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. Ann. § 438.2(A), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

190. The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs. and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

191. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

192. Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

1   193.   As a result of Defendant's violations of La. Rev. Stat. Ann. § 438.3 the State of

2   Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of

3   interest.

4   194.   RELATOR is a private citizen with direct and independent knowledge of the

5   allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann.

6   §439.1(A) on behalf of himself and the State of Louisiana.

7   195.   This Court is requested to accept pendant jurisdiction of this related state claim

8   as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

9   damages to the State of Louisiana in the operation of its Medicaid program.

10   WHEREFORE, RELATOR respectfully requests this Court to award the following

11   damages to the following parties and against Defendants:

12   To the STATE OF LOUISIANA:

13

14       (1)   Three times the amount of actual damages which the State of Louisiana
has sustained as a result of Defendants' conduct;

15       (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each
false claim which Defendants caused to be presented to the State of
Louisiana;

16       (3)   Prejudgment interest; and
    (4)   All costs incurred in bringing this action.

17   To RELATOR:

18       (1)   The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A)
and/or any other applicable provision of law;

19       (2)   Reimbursement for reasonable expenses which Relator incurred in
connection with this action;

20       (3)   An award of reasonable attorneys' fees and costs; and
    (4)   Such further relief as this Court deems equitable and just.

21

22

23   COUNT XI
HAWAII FALSE CLAIMS ACT

24   196.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

25   86 above as if fully set forth herein.

26   197.   This is a *qui tam* action brought by RELATOR on behalf of the State of Hawaii

27   to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat.

28   § 661-21 *et seq.*

198.  Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or d by the state;
> (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or
> (8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

199.  Defendants violated Haw. Rev. Stat. §661-21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

200.  The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

201.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

202.  Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

203.  As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1      204.    RELATOR is a private citizen with direct and independent knowledge of the

2   allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a)

3   on behalf of himself and the State of Hawaii.

4      205.    This Court is requested to accept pendant jurisdiction of this related state claim

5   as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

6   damages to the State of Hawaii in the operation of its Medicaid program.

7      WHEREFORE, RELATOR respectfully requests this Court to award the following

8   damages to the following parties and against Defendants:

9
    To the STATE OF HAWAII:
10
          (1)    Three times the amount of actual damages which the State of Hawaii has
11              sustained as a result of Defendants' illegal conduct;
          (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each
12              false claim which Defendants caused to be presented to the State of
                Hawaii;
13        (3)    Prejudgment interest; and
          (4)    All costs incurred in bringing this action.
14
    To RELATOR:
15
          (1)    The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27
16              and/or any other applicable provision of law;
          (2)    Reimbursement for reasonable expenses which Relator incurred in
17              connection with this action;
          (3)    An award of reasonable attorneys' fees and costs; and
18        (4)    Such further relief as this Court deems equitable and just.

19
                                COUNT XII
20       DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

21
       206.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through
22
    86 above as if fully set forth herein.
23
       207.    This is a *qui tam* action brought by RELATOR and the District of Columbia to
24
    recover treble damages and civil penalties under the District of Columbia Procurement Reform
25
    Amendment Act, D.C. Code § 2-308.13 *et seq.*
26
       208.    D.C. Code § 2-308.14(a) provides liability for any person who-
27
          (1) knowingly presents, or causes to be presented, to an officer or
28         employee of the District a false claim for payment or approval;
           (2) knowingly makes, uses, or causes to: be made or used, a false

                    FIRST AMENDED FALSE CLAIMS ACT COMPLAINT
                                      - 43 -

1    record or statement to get a false claim paid or approved by the
     District;
2    (3) conspires to defraud the District by getting a false claim
     allowed or paid by the District;
3    (8) is the beneficiary of an inadvertent submission of a false claim
     to the District, subsequently discovers the falsity of the claim, and
4    fails to disclose the false claim to the District.

5
     209.    In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to
6
     accept any type of remuneration for the following:
7

8            (1)    Referring a recipient to a particular provider of any item or
             service or for which payment may be made under the District of
9            Columbia Medicaid program, or
             (2)    Recommending the purchase, lease, or order of any good,
10           facility, service, or item for which payment may be made under the
             District of Columbia Medicaid Program.
11

12   210.    Defendants violated D.C. Code § 4-802(c) by engaging in the illegal conduct

13   described herein.

14   211.    Defendants furthermore violated D.C. Code § 2-308.14(a) and knowingly caused

15   thousands of false claims to be made, used and presented to the District of Columbia by its

16   deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-

17   Kickback Act D.C. Code § 4-802(c), and by virtue of the fact that none of the claims submitted

18   in connection with its illegal conduct were even eligible for reimbursement by the government-

19   funded healthcare programs.

20   212.    The District of Columbia, by and through the District of Columbia Medicaid

21   program and other state healthcare programs, and unaware of Defendants' illegal conduct, paid

22   the claims submitted by healthcare providers and third party payers in connection therewith.

23   213.    Compliance with applicable Medicare, Medicaid and the various other federal and

24   state laws cited herein was an implied, and upon information and belief, also an express condition

25   of payment of claims submitted to the District of Columbia in connection with Defendants' illegal

26   conduct. Compliance with applicable D.C. statutes, regulations and Pharmacy Manuals was also

27   an express condition of payment of claims submitted to the District of Columbia.

28   214.    Had the District of Columbia known that Defendants were violating the federal

1   and state laws cited herein and/or that the claims submitted in connection with Defendant's

2   conduct failed to meet the reimbursement criteria of the government-funded healthcare programs

3   or were premised on false and/or misleading information, it would not have paid the claims

4   submitted by healthcare providers and third party payers in connection with that conduct.

5        215.   As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of

6   Columbia has been damaged in an amount far in excess of millions of dollars exclusive of

7   interest.

8        216.   RELATOR is a private citizen with direct and independent knowledge of the

9   allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b)

10  on behalf of himself and the District of Columbia.

11       217.   This Court is requested to accept pendant jurisdiction of this related state claim

12  as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

13  damages to the District of Columbia in the operation of its Medicaid program.

14       WHEREFORE, RELATOR respectfully requests this Court to award the following

15  damages to the following parties and against Defendants:

16

To the DISTRICT OF COLUMBIA:

17

      (1)   Three times the amount of actual damages which the District of Columbia
18              has sustained as a result of Defendants' illegal conduct;
      (2)   A civil penalty of not less than $5,000 and not more than S10,000 for each
19              false claim which Defendants caused to be presented to the District of
              Columbia;
20      (3)   Prejudgment interest; and
      (4)   All costs incurred in bringing this action.
21

To RELATOR:

22

      (1)   The maximum amount allowed pursuant to D.C. Code § 2-308.15(f)
23              and/or any other applicable provision of law;
      (2)   Reimbursement for reasonable expenses which Relator incurred in
24              connection with this action;
      (3)   An award of reasonable attorneys' fees and costs; and
25      (4)   Such further relief as this Court deems equitable and just.

26
COUNT XIII
27
COMMONWEALTH OF VIRGINIA

28       218.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

86 above as if fully set forth herein.

1    219.    This is a *qui tam* action brought by RELATOR on behalf of the Commonwealth

2  of Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act §8.01-

3  216.3a provides liability for any person who-

        (1)    knowingly presents, or causes to be presented, a false or
5       fraudulent claim for payment or approval;
        (2)    knowingly makes, uses, or causes to be made or used, a
6       false record or statement to obtain payment or approval of a claim
        by the commonwealth or
7       (3)    conspires to defraud the commonwealth or any political
        subdivision thereof through the allowance or payment of a
8       fraudulent claim;
        (9)    is a beneficiary of an inadvertent submission of a false
9       claim to the common wealth or political subdivision thereof,
        subsequently discovers the falsity of the claim, and fails to disclose
10      the false claim to the commonwealth or political subdivision
        within a reasonable time after discovery of the false claim.

12   220.    In addition, VA Code ANN § 32.1-315 prohibits the solicitation, receipt or offering

13  of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in

14  cash or in kind in return for furnishing any good, service or item for which payment may be made

15  in whole or in part under the Virginia Medicaid program.

16   221.    Defendants violated VA Code ANN § 32.1-315 by engaging in the conduct

17  described herein.

18   222.    Defendants furthermore violated Virginia Fraud Against Tax Payers Act §8.01-

19  216.3a and knowingly caused hundreds of thousands of false claims to be made, used and

20  presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal

21  and state laws, including the FDCA, federal Anti-Kickback Act, VA Code ANN § 32.1-315 and

22  by virtue of the fact that none of the claims submitted in connection with its conduct were even

23  eligible for reimbursement by the government-funded healthcare programs.

24   223.    The Commonwealth of Virginia, by and through the Virginia Medicaid program

25  and other state healthcare programs, and unaware of Defendants' conduct, paid the claims

26  submitted by healthcare providers and third party payers in connection therewith.

27   224.    Compliance with applicable Medicare, Medicaid and the various other federal and

28  state laws cited herein was an implied, and upon information and belief, also an express condition

1  of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants'

2  conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was

3  also an express condition of payment of claims submitted to the Commonwealth of Virginia.

4      225.   Had the Commonwealth of Virginia known that Defendants were violating the

5  federal and state laws cited herein and/or that the claims submitted in connection with

6  Defendants' conduct failed to meet the reimbursement criteria of the government-funded

7  healthcare programs or were premised on false and/or misleading information, it would not have

8  paid the claims submitted by healthcare providers and third party payers in connection with that

9  conduct.

10      226.   As a result of Defendants' violations of Virginia Fraud Against Tax Payers Act

11  §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of

12  millions of dollars exclusive of interest.

13      227.   RELATOR is a private citizen with direct and independent knowledge of the

14  allegations of this Complaint, who has brought this action pursuant to Virginia Fraud Against Tax

15  Payers Act §8.01-216.3 on behalf of himself and the Commonwealth of Virginia.

16      228.   This Court is requested to accept pendant jurisdiction of this related state claim

17  as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

18  damages to the Commonwealth of Virginia in the operation of its Medicaid program.

19      WHEREFORE, RELATOR respectfully requests this Court to award the following

20  damages to the following parties and against Defendants:

21      To the Commonwealth Of Virginia:

22          (1)   Three times the amount of actual damages which the Commonwealth of
23               Virginia has sustained as a result of Defendants' conduct;
        (2)   A civil penalty of not less than $5,000 and not more than $10,000 for each
24               false claim which Defendants caused to be presented to the
             Commonwealth of Virginia;
25          (3)   Prejudgment interest; and
        (4)   All costs incurred in bringing this action.

26      To RELATOR:

27          (1)   The maximum amount allowed pursuant to VA Code ANN § 32.1-315
28               and/or any other applicable provision of law;
        (2)   Reimbursement for reasonable expenses which Relator incurred in
             connection with this action;

1     (3) An award of reasonable attorneys' fees and costs; and
     (4) Such further relief as this Court deems equitable and just.

2

3            COUNT XIV
     THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS LAW

4
    229. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

5
86 above as if fully set forth herein.

6
    230. This is a *qui tam* action brought by RELATOR on behalf of the State of New

7
Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care

8
False Claims Law, N.H. Rev.Stat. Ann§167:61-b.

9
    1. Any person shall be liable who...

10
     (a) knowingly presents, or causes to be presented, to an officer or employee of

11    the State a false or fraudulent claim for payment or approval;
     (2) knowingly makes, uses, or causes to be made or used, a

12    false record or statement to get a false or fraudulent claim paid or
    approved by the State;

13     (3) conspires to defraud the State by getting a false or
    fraudulent claim allowed or paid.

14

15    231. In addition, N.H. Rev.Stat. Ann. prohibits the solicitation or receipt of any

16 remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

17 in cash or in kind in return for furnishing any item or service for which payment may be made in

18 whole or in part under the New Hampshire Medicaid program.

19    232. Defendants violated the N.H. Rev.Stat. Ann by engaging in the conduct described

20 herein.

21    233. Defendants furthermore violated N.H. Rev.Stat. Ann. §167:61-b, and knowingly

22 caused hundreds of thousands of false claims to be made, used and presented to the State of New

23 Hampshire by its deliberate and systematic violation of federal and state laws, including the

24 FDCA, federal Anti-Kickback Act, and the New Hampshire Vendor Fraud and Kickback statute,

25 and by virtue of the fact that none of the claims submitted in connection with its conduct were

26 even eligible for reimbursement by the government-funded healthcare programs.

27    234. The State of New Hampshire, by and through the New Hampshire Medicaid

28 program and other state healthcare programs, and unaware of Defendants' conduct, paid the

1    claims submitted by healthcare providers and third party payers in connection therewith.

2        235.    Compliance with applicable Medicare, Medicaid and the various other federal and

3    state laws cited herein was an implied, and upon information and belief, also an express condition

4    of payment of claims submitted to the State of New Hampshire in connection with Defendants'

5    conduct. Compliance with applicable New Hampshire statutes, regulations and Pharmacy

6    Manuals was also an express condition of payment of claims submitted to the State of New

7    Hampshire.

8        236.    Had the State of New Hampshire known that Defendants were violating the federal

9    and state laws cited herein and/or that the claims submitted in connection with Defendants'

10    conduct failed to meet the reimbursement criteria of the government-funded healthcare programs

11    or were premised on false and/or misleading information, it would not have paid the claims

12    submitted by healthcare providers and third party payers in connection with that conduct.

13        237.    As a result of Defendants' violations of N.H. Rev.Stat. Ann. §167:61-b, the State

14    of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive

15    of interest.

16        238.    RELATOR is a private citizen with direct and independent knowledge of the

17    allegations of this Complaint, who has brought this action pursuant to N.H. Rev.Stat. Ann.

18    §167:61-b on behalf of himself and the State of New Hampshire.

19        239.    This Court is requested to accept pendant jurisdiction of this related state claim

20    as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

21    damages to the State of New Hampshire in the operation of its Medicaid program.

22        WHEREFORE, RELATOR respectfully requests this Court to award the following

23    damages to the following parties and against Defendants:

24

To the STATE OF New Hampshire:

25

        (1)    Three times the amount of actual damages which the State of New
26                 Hampshire has sustained as a result of Defendants' conduct;
        (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each
27                 false claim which Defendants caused to be presented to the State of New
                 Hampshire;
28        (3)    Prejudgment interest; and
        (4)    All costs incurred in bringing this action.

1    To RELATOR:

2    (1)    The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-
          b and/or any other applicable provision of law;
3    (2)    Reimbursement for reasonable expenses which Relator incurred in
          connection with this action;
4    (3)    An award of reasonable attorneys' fees and costs; and
     (4)    Such further relief as this Court deems equitable and just.
5

6                            COUNT XV
                    NEW YORK FALSE CLAIMS ACT
7

8    240.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

9    86 above as if fully set forth herein.

10   241.    This is a *qui tam* action brought by RELATOR on behalf of the State of New York

11   to recover treble damages and civil penalties under the New York False Claims Act, 2007 N.Y.

12   Laws 58, Section 39, Article XIII

13
          Section 189 provides liability for any person who:
14        1.(a)  knowingly presents, or causes to be presented, to any
          employee, officer or agent of the state or local government, a false
15        or fraudulent claim for payment or approval;
          1. (b) knowingly makes, uses, or causes to be made or used, a
16        false record or statement to get a false or fraudulent claim paid or
          approved by the state or local government;
17        1. (c) conspires to defraud the State by getting a false or fraudulent
          claim allowed or paid.
18

19   242.    In addition, the New York State Consolidated Laws prohibits the solicitation or

20   receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly

21   or covertly, in cash or in kind in return for furnishing any item or service for which payment may

22   be made in whole or in part under the New York Medicaid program.

23   243.    Defendants violated the New York State Consolidated Laws by engaging in the

24   conduct described herein.

25   244.    Defendants furthermore violated 2007 N.Y. Laws 58, Section 39, Article XIII, and

26   knowingly caused hundreds of thousands of false claims to be made, used and presented to the

27   State of New York by its deliberate and systematic violation of federal and state laws, including

28   the FDCA, federal Anti-Kickback Act, and the New York Vendor Fraud and Kickback statute,

1   and by virtue of the fact that none of the claims submitted in connection with its conduct were

2   even eligible for reimbursement by the government-funded healthcare programs.

3       245.   The State of New York, by and through the New York Medicaid program and other

4   state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

5   healthcare providers and third party payers in connection therewith.

6       246.   Compliance with applicable Medicare, Medicaid and the various other federal and

7   state laws cited herein was an implied, and upon information and belief, also an express condition

8   of payment of claims submitted to the State of New York in connection with Defendants'

9   conduct. Compliance with applicable New York statutes, regulations and Pharmacy Manuals was

10   also an express condition of payment of claims submitted to the State of New York.

11       247.   Had the State of New York known that Defendants were violating the federal and

12   state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

13   failed to meet the reimbursement criteria of the government-funded healthcare programs or were

14   premised on false and/or misleading information, it would not have paid the claims submitted by

15   healthcare providers and third party payers in connection with that conduct.

16       248.   As a result of Defendants' violations of 2007 N.Y. Laws 58, Section 39, Article

17   XIII, the State of New York has been damaged in an amount far in excess of millions of dollars

18   exclusive of interest.

19       249.   RELATOR is a private citizen with direct and independent knowledge of the

20   allegations of this Complaint, who has brought this action pursuant to 2007 N.Y. Laws 58,

21   Section 39, Article XIII, on behalf of himself and the State of New York.

22       250.   This Court is requested to accept pendant jurisdiction of this related state claim

23   as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

24   damages to the State of New York in the operation of its Medicaid program.

25       WHEREFORE, RELATOR respectfully requests this Court to award the following

26   damages to the following parties and against Defendants:

27       To the STATE OF New York:

28           (1)   Three times the amount of actual damages which the State of New York
               has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVI
## MICHIGAN MEDICAID FALSE CLAIMS ACT

251. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 86 above as if fully set forth herein.

252. This is a *qui tam* action brought by RELATOR on behalf of the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act, MI ST Ch. 400.603 et seq.

> 400.603 provides liability in pertinent part as follows:
> Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits;
> (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit...

253. In addition, MI ST Ch. 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate. directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

254. Defendants violated MI ST Ch. 400.603 et seq. by engaging in the conduct described herein.

255. Defendants furthermore violated, MI ST Ch. 400.603 et seq. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with

1    its conduct were even eligible for reimbursement by the government-funded healthcare programs.

2          256.    The State of Michigan, by and through the Michigan Medicaid program and other

3    state healthcare programs. and unaware of Defendants' conduct, paid the claims submitted by

4    healthcare providers and third party payers in connection therewith.

5          257.    Compliance with applicable Medicare, Medicaid and the various other federal and

6    state laws cited herein was an implied, and upon information and belief, also an express condition

7    of payment of claims submitted to the State of Michigan in connection with Defendants' conduct.

8    Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an

9    express condition of payment of claims submitted to the State of Michigan.

10          258.    Had the State of Michigan known that Defendants were violating the federal and

11    state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

12    failed to meet the reimbursement criteria of the government-funded healthcare programs or were

13    premised on false and/or misleading information, it would not have paid the claims submitted by

14    healthcare providers and third party payers in connection with that conduct.

15          259.    As a result of Defendants' violations of MI ST Ch. 400.603 et seq. the State of

16    Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

17          260.    RELATOR is a private citizen with direct and independent knowledge of the

18    allegations of this Complaint, who has brought this action pursuant to MI ST Ch. 400.603 et seq.

19    on behalf of himself and the State of Michigan.

20          261.    This Court is requested to accept pendant jurisdiction of this related state claim

21    as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

22    damages to the State of Michigan in the operation of its Medicaid program.

23          WHEREFORE, RELATOR respectfully requests this Court to award the following

24    damages to the following parties and against Defendants:

25          To the STATE OF Michigan:

26                (1)    Three times the amount of actual damages which the State of Michigan
                         has sustained as a result of Defendants' conduct;
27                (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each
                         false claim which Defendants caused to be presented to the State of
28                       Michigan;

1      (3)   Prejudgment interest; and
      (4)   All costs incurred in bringing this action.

2

To RELATOR:

3

      (1)   The maximum amount allowed pursuant to MI ST Ch. 400.603 et seq.
4             and/or any other applicable provision of law;
      (2)   Reimbursement for reasonable expenses which Relator incurred in
5             connection with this action;
      (3)   An award of reasonable attorneys' fees and costs; and
6      (4)   Such further relief as this Court deems equitable and just.

7
### COUNT XVII
### NEW MEXICO MEDICAID FALSE CLAIMS ACT

8

262.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

9

86 above as if fully set forth herein.

10

263.   This is a *qui tam* action brought by RELATOR on behalf of the State of New

11

Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against

12

Taxpayers Act N.M. Stat. Ann§§ 27-14-1 et seq.

13

    Section 3 provides liability in pertinent part as follows:
14    A. A person shall not:
      (1)   knowingly present, or cause to be presented, to an
15    employee, officer or agent of the state or to a contractor, grantee,
    or other recipient of state funds a false or fraudulent claim for
16    payment or approval;;
      (2)   knowingly make or use, or cause to be made or used, a
17    false, misleading or fraudulent record or statement to obtain or
    support the approval of or the payment on a false or fraudulent
18    claim;
      (3)   conspire to defraud the state by obtaining approval or
19    payment on a false or fraudulent claim...

20    264.   In addition, N.M. Stat. Ann§§ 30-44-7 ct seq. prohibits the solicitation or receipt

21  of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or

22  covertly, in cash or in kind in return for furnishing any item or service for which payment may

23  be made in whole or in part under the New Mexico Medicaid program.

24    265.   Defendants violated N.M. Stat. Ann§§ 30-44-7 et seq by engaging in the conduct

25  described herein.

26    266.   Defendants furthermore violated. N.M. Stat. Ann§§ 27-14-1 ct seq. and knowingly

27  caused hundreds of thousands of false claims to be made, used and presented to the State of New

28  Mexico by its deliberate and systematic violation of federal and state laws, including the FDCA,

1   federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in
2   connection with its conduct were even eligible for reimbursement by the government-funded
3   healthcare programs.

4          267.    The State of New Mexico, by and through the New Mexico Medicaid program and
5   other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted
6   by healthcare providers and third party payers in connection therewith.

7          268.    Compliance with applicable Medicare, Medicaid and the various other federal and
8   state laws cited herein was an implied, and upon information and belief, also an express condition
9   of payment of claims submitted to the State of New Mexico in connection with Defendants'
10  conduct. Compliance with applicable New Mexico statutes, regulations and Pharmacy Manuals
11  was also an express condition of payment of claims submitted to the State of New Mexico.

12         269.    Had the State of New Mexico known that Defendants were violating the federal
13  and state laws cited herein and/or that the claims submitted in connection with Defendants'
14  conduct failed to meet the reimbursement criteria of the government-funded healthcare programs
15  or were premised on false and/or misleading information, it would not have paid the claims
16  submitted by healthcare providers and third party payers in connection with that conduct.

17         270.    As a result of Defendants' violations of N.M. Stat. Ann§§ 27-14-1 et seq. the State
18  of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of
19  interest.

20         271.    RELATOR is a private citizen with direct and independent knowledge of the
21  allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann§§ 27-14-1
22  et seq. on behalf of himself and the State of New Mexico.

23         272.    This Court is requested to accept pendant jurisdiction of this related state claim
24  as it is predicated upon the exact same facts as the federal claim, and merely asserts separate
25  damages to the State of New Mexico in the operation of its Medicaid program.

26         WHEREFORE, RELATOR respectfully requests this Court to award the following
27  damages to the following parties and against Defendants:

28

1     To the STATE OF New Mexico:

2         (1)    Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

3         (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New

4           Mexico;

5         (3)    Prejudgment interest; and
          (4)    All costs incurred in bringing this action.

6     To RELATOR:

7         (1)    The maximum amount allowed pursuant to N.M. Stat. Ann§§ 27-14-1 et seq. and/or any other applicable provision of law;

8         (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

9         (3)    An award of reasonable attorneys' fees and costs; and
          (4)    Such further relief as this Court deems equitable and just.

10

11                          COUNT XVIII
    INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

12

13     273.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

14   86 above as if fully set forth herein.

15     274.    This is a *qui tam* action brought by RELATOR on behalf of the State of Indiana

16   to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower

17   Protection Act, INDIANA Code 5-11-5.5 et seq

18         (b) A person who knowingly or intentionally:

19         (1) presents a false claim to the state for payment or approval;
          (2) makes or uses a false record or statement to obtain payment or

20         approval of a false claim from the state;
          (3) with intent to defraud the state, delivers less money or property

21         to the state than the amount recorded on the certificate or receipt
          the person receives from the state;

22         (4) with intent to defraud the state, authorizes issuance of a receipt
          without knowing that

23         (5) receives public property as a pledge of an obligation on a debt
          from an employee who is not lawfully authorized to sell or pledge

24         the property;
          (6) makes or uses a false record or statement to avoid an obligation

25         to pay or transmit property to the state;
          (7) conspires with another person to perform an act described in

26         subdivisions (1) through (6); or
          (8) causes or induces another person to perform an act described

27         in subdivisions (1) through (6)...

28         a penalty or damages.

1

2

275. In addition, INDIANA Code 5-11-5.5 et seq. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Indiana Medicaid program.

276. Defendants violated the INDIANA Code 5-11-5.5 et seq. by engaging in the conduct described herein.

277. Defendants furthermore violated INDIANA Code 5-11-5.5 et seq. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Indiana Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

278. The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

279. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

280. Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

281. As a result of Defendants' violations of INDIANA Code 5-11-5.5 et seq., the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1   282. RELATOR is a private citizen with direct and independent knowledge of the

2 allegations of this Complaint, who has brought this action pursuant to INDIANA Code 5-11-5.5

3 et seq. on behalf of himself and the State of Indiana.

4   283. This Court is requested to accept pendant jurisdiction of this related state claim

5 as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

6 damages to the State of Indiana in the operation of its Medicaid program.

7   WHEREFORE, RELATOR respectfully requests this Court to award the following

8 damages to the following parties and against Defendants:

9   To the STATE OF Indiana:

10    (1) Three times the amount of actual damages which the State of Indiana has
      sustained as a result of Defendants' conduct;

11    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each
      false claim which Defendants caused to be presented to the State of

12      Indiana;
    (3) Prejudgment interest; and

13    (4) All costs incurred in bringing this action.

14   To RELATOR:

15    (1) The maximum amount allowed pursuant to INDIANA Code 5-11-5.5 et
      seq. and/or any other applicable provision of law;

16    (2) Reimbursement for reasonable expenses which Relator incurred in
      connection with this action;

17    (3) An award of reasonable attorneys' fees and costs; and
    (4) Such further relief as this Court deems equitable and just.

18

19   DATED: August 1, 2008.      NOLAN & AUERBACH, P.A.

20

21             By:
               Matthew Pavone

22              Attorney for Plaintiff/Relator
              JOHN PRIEVE

23              Kenneth J. Nolan, Esq.

24              Marcella Auerbach, Esq.

25

26

27

28