ORIGINAL

KENNETH J. NOLAN, Esq. (FL SBN 603406)
MARCELLA AUERBACH, Esq. (FL SBN 249335)
NOLAN & AUERBACH, P.A.
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
(954) 779-3943
(954) 779-3937 (fax)

MATTHEW B. PAVONE, Esq. (CA SBN 95964)
NOLAN & AUERBACH, P.A.
Courtyard Square
750 Grant Avenue, Suite 250
Novato, CA 94945
(415) 209-9610
(415) 892-0337 (fax)

Attorneys for Plaintiff John Prieve

FILED
APR 25 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA; and THE STATES CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, WISCONSIN, THE COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA; and THE DISTRICT OF COLUMBIA; ex rel. JOHN PRIEVE.

Plaintiffs and Relator

v.

MALLINCKRODT, INC.
COVIDIEN, INC., and
TYCO INTERNATIONAL (US), INC.
TYCO HEALTHCARE GROUP, L.P.

Defendants

CIVIL ACTION NO.: C08-1863 ~~WDB~~ TEH

FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

FILE BY FAX

**SECOND AMENDED FALSE CLAIMS ACT COMPLAINT**

INTRODUCTION

1. Qui tam Relator JOHN PRIEVE brings this action on behalf of the United States against MALLINCKRODT, INC., COVIDIEN, INC., TYCO INTERNATIONAL (US), INC., and TYCO HEALTHCARE GROUP, L.P. (hereinafter collectively referred to as Defendants) for treble damages and civil penalties arising from Defendants' conduct in violation of the Civil False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"). The violations ar ise out of requests for payment by Medicaid, Medicare, TRICARE, and other federally-funded government healthcare programs (hereinafter collectively referred to as "Government Healthcare Programs").

2. This action is also brought under the respective *qui tam* provisions of False Claims Acts (or similarly named) on behalf of the STATE OF CALIFORNIA, the STATE OF COLORADO, the STATE OF CONNECTICUT, the STATE OF DELAWARE, the STATE OF FLORIDA, the STATE OF GEORGIA, the STATE OF HAWAII, the STATE OF ILLINOIS, the STATE OF INDIANA, the STATE OF LOUISIANA, the STATE OF MARYLAND, the STATE OF MICHIGAN, the STATE OF MINNESOTA, the STATE OF NEVADA, the STATE OF NEW HAMPSHIRE, the STATE OF NEW JERSEY, the STATE OF NEW MEXICO, the STATE OF NEW YORK, the STATE OF NORTH CAROLINA, the STATE OF OKLAHOMA, the STATE OF RHODE ISLAND, the STATE OF TENNESSEE, the STATE OF TEXAS, the STATE OF WISCONSIN, the COMMONWEALTH OF MASSACHUSETTS, the COMMONWEALTH OF VIRGINIA, and the DISTRICT OF COLUMBIA. These states, along with the UNITED STATES, are hereafter collectively referred to as the Government.

3. This Complaint describes violations of the False Claims Act by offering and paying to physicians and other healthcare providers (hereinafter sometimes collectively referred to as "providers"), to induce them to prescribe certain pharmaceutical products. The practices, part of a highly organized and often blatant campaign, involved paying physicians as "consultants," and included: (1) Providing payments for phony drug trials and phony data collection; (2) Providing kickbacks in the form of lavish entertainment, (3) Providing phony speaker fees a/k/a "honorariums"; (4) Providing payments for phony preceptorships; (5) Using "advisory panel meetings" as inducements; (6) Creating phony paperwork programs as a means to provide kickbacks. This Complaint also

describes violations of the False Claims Act by actively promoting certain products for "off-label" uses, which uses were not covered under any Government Program.

4. Relator has complied with all procedural requirements of the laws under which this case is brought.

5. Relator is informed and believes that the pervasive kickbacks and false claims described herein began at latest in 2004, and continues to date.

## FEDERAL JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the State-law claims. Under 31 U.S.C. § 3730(e), and under the comparable provisions of the State statutes, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

7. This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because the Defendant has minimum contacts with the United States. Moreover, Defendant Covidien can be found in and transacts business in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendant Covidien can be found in and transacts business in this District. At all times relevant to this Complaint, Defendant regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

9. The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

10. Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

11. Defendant MALLINCKRODT INC., (hereinafter referred to as MALLINCKRODT) is a

Delaware corporation with its principal place of business located in Hazelwood, MO. From 2000 until 2007, it was a business unit of Tyco Healthcare, Group, L.P., a subsidiary of Tyco International, Ltd. In July 2007, Tyco International spun off into three separate companies: Tyco International, Tyco Electronics, and Covidien. With the split in 2007, said Defendant became a subsidiary of Covidien, Ltd. (U.S.), whose headquarters are located in Mansfield, MA.

12. Defendant, COVIDIEN INC., f/k/a Tyco Healthcare Group, whose headquarters is in Mansfield, MA., has at all material times full knowledge and participation in the actions which give rise to False Claims Act liability alleged herein. Covidien Inc., is the U.S. affiliate of Covidien Ltd., a foreign corporation. Covidien's principal place of business in the United States is in the state of Massachusetts. Its international headquarters is located at 20 Lower Hatch Street, Dublin 2, Ireland. As of July 2007, Covidien is successor in interest to Tyco Healthcare Group LP. Tyco Healthcare Group LP was a limited partnership formed under the laws of Delaware, and its principal place of business is in Mansfield, Massachusetts. Mallinckrodt Inc., was a limited partner of Tyco Healthcare Group LP.

13. Defendant, TYCO INTERNATIONAL (US), Inc., is a Nevada Corporation with its principal place of business at 9 Roszel Road, Princeton, New Jersey. Through July 2007, it has had at all material times full knowledge and participation in the actions which give rise to False Claims Act liability alleged herein. It was the parent company of Tyco Healthcare Group LP.

14. Defendant TYCO HEALTHCARE GROUP, L.P. is a limited partnership, which is a citizen of the State of Massachusetts. Its principal place of business is the Town of Mansfield, State of Massachusetts. Defendant is also subject to personal jurisdiction in Santa Clara County, California, in this District.

15. Relator, JOHN PRIEVE, is a resident of the State of Illinois, and was formerly employed by Defendants Tyco Healthcare Group, L.P. and Covidien, Inc. as a District Manager in Defendant MALLINCKRODT's Brand Pharma Division.

16. MALLINCKRODT's "Brand Pharma" division currently sells the following drugs: Restoril, Tofranil PM, Magnacet, Anafronil, Depade, Methadose and Pamelor. Only Restoril, Tofranil PM and Magnacet are actively promoted by the sales representatives, and are the subject of this lawsuit.

17. Relator brings this action based on his direct knowledge and, where indicated, on information

and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4), and Relator is an original source of the facts alleged in this Complaint.

18. At all times relevant hereto, Defendants acted through their agents and employees, and the acts of Defendants' agents and employees were within the scope of their agency and employment. The policies and practices alleged in this complaint were, on information and belief, established and/or ratified at the highest corporate levels of Defendants.

THE DRUGS

19. The conduct alleged in this lawsuit applies to three drugs caused to be and/or actually marketed by the Defendants, as follows:

a. Tofranil-PM (imipramine pamoate) capsules are FDA labeled as "indicated for the relief of symptoms of depression. Endogenous depression is more likely to be alleviated than other depressive states." The original NDA (017090) was approved on March 11, 1973.

b. MALLINCKRODT obtained an ANDA for a generic version of Tofranil-PM in 2006. It then began promoting both the generic and brand versions. Even though it was "generic," it was the only generic and therefore it was priced merely 10% less than the brand version. It included a Black Box warning regarding the increased risk of suicidality in children (as do all antidepressants).

c. Tofranil is a tricyclic antidepressant. Tricyclic antidepressant are a class of antidepressant drugs first used in the 1950s. In the past decade, the prescription of selective serotonin reuptake inhibitors (SSRIs) for the treatment of depression has far surpassed that of TCAs. However, TCAs remain second only to analgesics as the most common drugs implicated in overdose fatalities. Some evidence suggests that TCAs are associated with more overdose fatalities per number of prescriptions issued than other antidepressant classes. (Samara Soghoian, M.D. "Toxicity, Tricyclic Antidepressant," retrieved on 3/25/08 at www.emedicine.com).

20. Restoril (temazepam) capsules FDA label states that it is indicated:

> . . . for the short-term treatment of insomnia (generally 7-10 days). For patients with short-term insomnia, instructions in the prescription should indicate that Restoril® (temazepam) should be used for short periods of

> time (7-10 days). The clinical trials performed in support of efficacy were 2 weeks in duration with the final formal assessment of sleep latency performed at the end of treatment.

a. Restoril 7.5MG, 15MG, and 30MG.were approved by the FDA on February 27, 1981. Four companies are approved for therapeutic equivalence for the 15MG and 30MG capsule. The 7.5 mg capsule has patent protection through 2010. In addition a 22.5mg strength was FDA-approved in November 2004, and launched by MALLINCKRODT in early 2005.

b. MALLINCKRODT has promoted the 7.5mg and 22.5mg doses only, because it has no competition for those doses. MALLINCKRODT has marketed the 7.5mg dose by producing a study that purportedly showed that the 7.5mg had efficacy equal to the 15mg dose and therefore the 7.5mg was an appropriate lowest effective dose for temazepam (because side effects would be lower). MALLINCKRODT promoted the 22.5mg dose over the 30mg dose with the same study, by employing a "dose-response" curve analogy. The promoted doses had no competition while the un-promoted doses did.

c. Restoril (temazepan) is a Schedule IV controlled substance. Medical literature references its high abuse potential.

21. Magnacet™ (oxycodone/acetaminophen) capsules are available in 2.5\400, 5/400, and 7.5/400, and 10/400 MG strengths. All acetaminophen/oxycodone products, are indicated "for the relief of moderate to moderately severe pain." Although not detailed herein, the marketing practices attributable to Tofranil-PM and Restoril as it related to kickbacks are also applicable to Magnacet, since its FDA approval in March 2006.

22. Medicaid reimbursement information concerning Tofranil-PM, generic imipramine pamoate, and Restoril, is provided (in approximation) below:

| PRODUCT | TOTAL 2002 THRU 3RD QTR 2007 |
|---|---|
| RESTORIL 22.5 MG | $358,309 |
| RESTORIL 7.5 MG | $25,377,775 |
| | $25,736,084 |
| RESTORIL 15 MG | $204,450 |
| RESTORIL 30 MG | $743,583 |
| | $948,033 |
| TOFRANIL PM 75MG CAPS | $7,946,224 |
| TOFRANIL PM 100MG CAPS | $1,947,575 |
| TOFRANIL PM 125MG CAPS | $221,243 |
| TOFRANIL PM 150MG | $2,077,910 |
| | $12,192,952 |
| IMIPRAMINE PAMOATE | $1,087,249 |
| IMIPRAMINE PAMOATE | $327,141 |
| IMIPRAMINE PAMOATE | $20,343 |
| IMIPRAMINE PAMOATE | $212,385 |
| | $1,647,118 |
| TOTAL | $40,524,187 |

23. Tofranil-PM and its generic are available under most Medicare Part D plans. Restoril, as a benzodiazepine, is excluded from Medicare Part D coverage altogether.

## THE REGULATORY ENVIRONMENT

24. Pursuant to the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid, and TRICARE.

25. The Anti-Kickback Act is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

26. Every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of health care services in the United States.

27. The Anti-Kickback Act prohibits suppliers such as pharmaceutical manufacturers from

compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

28. The Federal False Claims Act provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729. A violation of the Anti-kickback Act is a violation of the False Claims Act.

29. The United States Food, Drug and Cosmetic Act (FDCA) establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States, including the introduction of new drugs into interstate commerce. When the United States Food and Drug Administration ("FDA") approves a drug, it approves the drug only for the particular use for which it was tested, but after the drug is approved for a particular use, the FDCA does not regulate how the drug may be prescribed. Thus, a drug that has been tested and approved for one use only can also be prescribed by a physician for another use, known as an "off-label" use.

30. While a physician may prescribe a drug for a use other than one for which it is approved, the FDCA prohibits a drug manufacturer from *marketing or promoting* a drug for non-approved uses. 21 U.S.C. § 331(d), 355(a). It therefore is illegal for a drug manufacturer and its sales representatives to initiate discussions with medical professionals regarding any off-label use of the drug.

31. The dissemination of information or materials by a pharmaceutical manufacturer of any unapproved or off-label use, also known as "misbranding," constitutes unlawful promotional advertising of the drug and violates the FDCA.

32. In addition to prohibiting manufacturers from directly marketing and promoting a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from employing indirect methods to accomplish the same end. For example, the FDA regulates two of the most prevalent indirect promotional strategies: (A) manufacturer dissemination of medical and scientific publications

concerning the off-label uses of their products; and (B) manufacturer support for Continuing Medical Education ("CME") programs that focus on off-label uses.

33. With regard to the first practice—disseminating written information—the FDCA allows a manufacturer to disseminate information regarding off-label usage only in response to an "unsolicited request from a health care practitioner." 21 U.S.C. §360aaa-6 (emphasis added). In any other circumstance, a manufacturer is permitted to disseminate information concerning the off-label uses of a drug only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use; and has provided the materials to the FDA prior to dissemination. The materials must be submitted in an unabridged form and must not be false or misleading. 21 U.S.C. §§ 360aaa(b) & (c);360aaa-1.

34. In sum, the off-label regulatory scheme protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body—the FDA.

35. Reasons why Congress made off-label marketing and promotion by drug manufacturers illegal include, without limitation, the following:

(a) Off-label promotion diminishes or eliminates the drug manufacturer's incentive to study the use of its drug and obtain definitive safety and efficacy data;

(b) Off-label promotion harms patients as the result of unstudied uses that lead to adverse results, or are ineffective;

(c) Off-label promotion diminishes the use of evidence-based medicine; and

(d) Off-label promotion erodes the efficacy standard in medicine.

UNLAWFUL PROMOTION

36. Without financial inducement to the providers, the majority of the prescriptions for Defendants' drugs would absolutely not be prescribed.

37. The illegal activity alleged herein was first communicated to Relator in a July 22, 2005 sales management meeting, likely in St. Louis, Mo.

38. Management made it clear that it was looking for shady doctors that were "high volume tricyclic

antidepressant and sleeper writers" who would be receptive to MALLINCKRODT's "consulting" arrangements. Physicians with "good access" or "excellent access" was a euphemism for physicians who would be receptive to prescribing Defendants' products.

**KICKBACKS - FIELD MARKETING SPECIALIST PROGRAM**

**Introduction**

39. As Tofranil-PM and Restoril were considered out-dated, third-rate drugs, it took kickbacks to effectuate prescription sales, and MALLINCKRODT implemented its kickbacks, in 2005, through the Field Marketing Specialist Program ("FMSP"). The FMSP program was designed to recruit physicians with high prescription volume in the sleep hypnotic, depression or pain markets, through monetary inducements. The Field Marketing Specialists (FMS's) were brought in to assist the sales representatives to obtain physicians as "consultants."

40. Physicians were targeted as "consultants" based upon (1) the volume of tricyclic antidepressant and/or sleeper medications they typically wrote; (2) and the extent to which they were *willing* to be a "consultant."

41. Whether or not MALLINCKRODT would hire a "consultant" was primarily determined by whether or not the "consultant" was willing to "play ball" by prescribing its 20-30 year old drugs in higher volumes. It was made clear to potential physician consultants during the initial meeting with the FMS, that MALLINCKRODT was looking for 50-60 prescriptions a month of their products while employed as a "consultant" doing "data collection or other projects."

**Foundation of the Kickbacks : The Consulting Agreements**

42. The vehicle to pay the providers were based upon consulting arrangements set forth in two Consulting Agreements, each implemented at different times. The 2005 Consulting Agreement, was the main vehicle to implement the kickbacks. The entire Agreement is boiler plate and could almost apply to any consultant for any business. The fourth paragraph of page 1, entitled "Compensation," provides:

> . . . Mallinckrodt will pay Consultant at the rate of $250 per hour which shall be paid to consultant within 45 days of receipt of Consultant's invoice and Consultant shall bill Mallinckrodt in 1/4 hour increments and provide Mallinckrodt with detailed time

entries describing work performed...

43. Consultants were paid upon the submission of a form invoice prepared by MALLINCKRODT.

44. Doctors were referred to on internal spreadsheets as "sales consultants" or "marketing consultants." Typically a "sales consultant" was a speaker, or at least would be paid honorariums as a speaker out of the District-level budget. A "marketing consultant," on the other hand, was paid from the home office marketing budget and typically was paid for other purported reasons in addition to speaker fees.

**Kickback Programs**

**Trials**

45. MALLINCKRODT set up "clinical trials" for their decades old drugs, solely for the purpose of generating sales. Unlike legitimate clinical trials: (1) The "clinical trials" were placed and managed by the MALLINCKRODT's sales force, not any research division; (2) Sales representatives would help a physician fill out the "clinical trial" forms; (3) Internal e-mails outwardly admit that their primary role was to generate sales for the sales force, not produce legitimate results which could be used for research on their products.

46. Providers were recruited from *any* specialty, and the goal was to get the targeted physician to agree to convert or start a certain number of patients from his/her practice, on either Restoril, Tofranil-PM, (or later, Magnacet). The number of patients mutually agreed as "necessary" for the clinical trial was usually in the range of 50-60 per month. The physician consultant, was compensated at a rate of $250.00 per hour for their time spent to convert or initiate therapy on one of MALLINCKRODT's drugs from the physician's patient pool.

47. The "consultant" was paid by billing MALLINCKRODT using a simple form invoice that was prepared by MALLINCKRODT and often completed by MALLINCKRODT's employees. Some physicians were set up for the mutually agreed number of hours per month for their consultantships, which were to continue as long as the patient volume on MALLINCKRODT's products remained at a certain level. The "studies" were not even remotely scientific. Since only the sales force was involved with the data, there were no designs, protocol or anything that is ordinarily used in a clinical trial. In

fact, the Mallinckrodt Brand Pharma division consists only of marketing, sales, sales operations and training, and business development departments. There is no research and development department in the division. Feedback was given to the FMS through either a dinner meeting (for which the consultant was again paid) or other informal method, usually just mailed to the FMS by the physician with no actual verification of time worked for the month.

**Speaker Programs**

48.     Another way to put money in a physician's pocket was to have him be a "consultant" *speaker*. For the consultants to perform speaker programs, there were neither slide sets  nor training provided. The speaker programs consisted simply of a small number of physicians invited to a lunch/dinner, typically with known physician acquaintances or from whom the speaker received referrals, to discuss the "consultant's" experience with the product(s).

**Preceptorships**

49.     Preceptorships were ostensibly a teaching session in which a physician would teach the FMS certain technical aspects of his practice, in exchange for the sum of $ 250/per hour. In actuality, preceptorships were used to provide monetary inducements to physicians.     Although MALLINCKRODT paid thousands of dollars to  physicians for preceptorships, the teaching portion was almost never performed. Rather, it was simply another example of paid access to the physician by the FMS in order to facilitate a sales presentation opportunity of MALLINCKRODT's products. The FMS would typically use the time to provide clear and direct feedback regarding the physician's prescription performance. Preceptorships were sometimes repeated with the same physicians several times over and over.  MALLINCKRODT issued 1099s to each physician who received these type of payments.

50.     In contrast to a pharmaceutical company that does not illegally use preceptorships as kickbacks, MALLINCKRODT's FMS team: (1) did not need manager approval to conduct preceptorships; (2) could perform unlimited preceptorships, including multiple times within the same physician group or physician; (3) could pay $250/hour to the physician and spend as much or little time with the physician as they wanted; (4) almost always used preceptorships for reasons other than educational purposes, e.g.

to get to know the physician, pay-off the physician, or make up for some loss that a physician incurred.

**Advisory Panel Meetings**

51. These meetings were for the ostensible purpose of getting input/feedback from physicians on drug performance, how they treat disease states, etc., although internal e-mails clearly admit otherwise. During the Advisory Panel meetings, honorariums, lavish entertainment and expenses for physicians were paid for by MALLINCKRODT.

52. Advisory Panels were utilized not only to pay-off prescribing physicians, they were also utilized to get feedback from the physicians for how to market Tofranil-PM to other physicians. Indeed, the MALLINCKRODT was transparent, by referring to the meetings as "TPM *message* research programs." Physicians, nevertheless, would not be invited unless they were high prescribers.

**Phony Paperwork Programs**

53. These programs were designed to induce physicians to prescribe MALLINCKRODT's products, in exchange for money and the intent to do so is fairly obvious from the documentation in relator's possession.

54. The Pharmacy Call Back program involved telling the physician to fill out one line in the Pharmacy Call Back form when therapy was initiated with MALLINCKRODT's product. If a pharmacist was calling regarding a particular prescription that the physician wrote, the physician was to write down what the pharmacist said e.g. "Dr. may I switch this to generic?" Every line filled out on the Pharmacy Call Back Form was worth about 15 minutes to the doctor. If the doctor filled up 4 lines of prescription call-backs, for instance, the physician received $250 for an hour's worth of work.

55. The physician's duties for Managed Care Plans were analogous to the Pharmacy Call Back. If the physician was called by the pharmacist from a managed care plan regarding MALLINCKRODT's drugs, (and therefore the MALLINCKRODT's drugs were covered by the managed care plan), the physician was paid, per line. Every 4 lines were worth $250, for an hour of the physician's time.

Termination of the FMS Program and Conversion to Speaker Programs Only.

56. The FMS program was discontinued on September 30, 2007, and the consultant's role was to changed to speaking programs only. In other words, providers could receive payment from MALLINCKRODT as a "consultant" only for participating in speaker programs. With the sudden

termination of the FMS program, which had a variety of ways to pay a physician, planning for the transition to the MDS program, only, was non-existent, and therefore sales temporarily suffered (because kickbacks decreased temporarily).

57. With the termination of the FMS program, the 2005 Consulting Agreement was modified. The compensation provision in the new, 2007 Consulting Agreement, now tailored only to speaking engagements, and provided only for a flat fee:

> . . . Mallinckrodt will pay Consultant an Honorarium at the rate of $1500 per standard event... a standard event is any speaking engagement or peer-to-peer education event that occurs after standard business hours (9-5, Monday through Friday) and within 100miles of Consultant's place of business. For events occurring during business hours within 100 miles of Consultant's place of business the rate will be 2/3 of the standard event rate or . .. $1,000. For events more than 100 miles from Consultant's place of business, regardless of time, the rate will be 2 times the standard rate or $3,000 to compensate the Consultant for additional time involved with traveling but not limited to expenses (see below), though if multiple events are planned in one extended trip, only the first will be paid at the higher rate for travel while additional events during the same contiguous trip will be paid at the appropriate rate for the event as if it was within 100 miles of the consultant's place of business. Any expenses associated with events that are incurred by the Consultant should be approved in advance and billed and paid separately from Compensation described herein. In the event that the Consultant is requested to provide assistance to Mallinckrodt on an hourly basis on a specific project, then the rate for such hourly work will be $250 per hour.

58. After September 30, 2007, Relator believes that the kickbacks have continued at the same levels, but they have largely been paid through speaking engagements.

## OTHER VIOLATIONS

**Off-label Tofranil-PM**

59. Defendants were well aware that its sales force was marketing Tofranil (or its generic, imipramine pamoate - IP) for off-label use, as they were directed to do so. From the beginning of training, the sales force was prepped on the off-label uses of tricyclic antidepressants.

60. Tofranil-PM was promoted off-label, in order of prescription prevalence, for pain (fibromyalgia, body pain and neuropathies), migraines, sleep, and enuresis/incontinence (the latter which involved some pediatrician prescribing).

61. About 75% of all prescriptions of Tofranil-PM were written for these off-label uses. The

targeted specialties called upon included: primary care physicians, neurologists, gastroenterologists, occupational medicine physicians, orthopedists, anaesthesiologists, urologists and rheumatologists. To help in their detailing, MALLINCKRODT made 2 reprints authored by John Zajecka, M.D. each having a paragraph referencing off-label uses of TCAs. These reprints were made available to sales representatives for distribution to physicians regardless of practice specialty.

62. In order to successfully carry out the off-label promotion, MALLINCKRODT conducted national sales meetings, regional and district meetings, designed specifically for the purpose of training representatives on off-label sales and marketing practices.

63. Indeed, Sales Representatives were trained on off-label marketing techniques such as: (a) copying and distributing studies; (b) sales calls solely for the purpose of off-label selling; (c) educating physicians on reimbursement/coding so that off-label claims would be covered for their patients.

64. Uniform and widespread tactics used by MALLINCKRODT to promote off-label, in conjunction with kickbacks, included hiding behind "CME" Speaker Programs via physicians and other healthcare providers to promote off-label usage. These programs were controlled and promoted by MALLINCKRODT, and had little, if anything, to do with the advertised content of the program.

65. As a result of these tactics, when physicians and pharmacies and possibly other healthcare providers expressly certified, as a precondition to payment, that they would comply with the terms set out on Form HCFA-1500 (which includes language that the services were "medically indicated and necessary for the health of the patient") and other claims for payment, the claims they submitted were false because the drugs were neither medically indicated and necessary, for the off-label uses, under Government Healthcare Programs, as explained below.

**Claims Submitted to Government Healthcare Programs Were Not Covered**

66. Although states may pay for any drug for any indication, they must do so without (Federal Financial Participation) FFP if the drug, as prescribed, is not for a medically acceptable use. FFP is available to states only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is not a medically accepted indication." Id. § 1396r-8(k)(3). A medically accepted indication is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" ("FDCA") or which is "supported by one or more

citations included or approved for inclusion" in specified drug compendia. Id. § 1396r-8(k)(6). 42 U.S.C.§ 1396r-8(g)(1)(B)(I) identifies the compendia to be consulted: American Hospital Formulary Service Drug Information; United States Pharmacopeia-Drug Information; and the DRUGDEX Information System. The compendia will hereinafter be referred to collectively as "the Drug Compendia."

67. When pharmacies, physicians and other healthcare providers submitted claims based upon a physician's prescription for Tofranil-PM for off-label uses, the claims they submitted were false because such off-label uses were not supported by a citation in one of the Drug Compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(I).

68. Medicare Part A is funded primarily by a federal payroll tax, premiums paid by Medicare beneficiaries and appropriations from Congress. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e - 42 U.S.C. §§1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

69. Medicare Part B is optional to beneficiaries and covers some healthcare benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C. §§1395j - 42 U.S.C. §§1 395w-4. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517. These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

70. On January 1, 2006, Part D of the Medicare program began providing drug coverage for all beneficiaries. The drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. §1396r-8(k). The off-label uses discussed herein are not supported by "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined to be "medically accepted generally as safe and effective" for such uses.

71.     In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

72.     The off-label uses of Tofranil-PM promoted by MALLINCKRODT were not eligible for reimbursement under any of the various federal health care programs. Coverage of off-label drug use under these programs is similar to coverage under the Medicaid program. See, e.g., TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

73.     Defendants were aware that the natural and probable consequence of its promotion of off-label uses of Tofranil-PM was that health care providers would submit claims for payment to these and other government payors for the off-label use.

74.     Notwithstanding this knowledge, Defendants illegally, vigorously, and without any thought to the possible negative health effects to which it subjected patients, promoted off-label uses of Tofranil-PM.  Defendants were aware that its illegal promotion did in fact result in false claims to these and other government payors for the off-label use.  Defendants were aware that its promotional activities were a substantial factor in producing the claims.

75.     False claims to these government healthcare programs for off-label prescribing of Tofranil-PM was the direct and proximate result of unlawful off-label marketing efforts by Defendants.  Defendants caused the submission of these claims.

76.     Defendants caused the submission of false claims, since healthcare providers submitted Pharmacy Claim Forms and CMS-1500 Forms to Government Healthcare Programs, and the states submitted Form CMS-64 to the Federal Government, all claiming reimbursement for Tofranil-PM for such off-label uses.

**Pricing Violations**

77.     Pharmaceutical manufacturers participating in Medicaid programs must rebate to the states, a certain statutorily-prescribed portion of the price of drugs purchased by each Medicaid program in each state. See 42 U.S.C. §1396r-8(a)(1).  Manufacturers do this because the Medicaid statute, 42 U.S.C. §§1396a-u, permits the federal government to partially reimburse states only for drugs purchased from

manufacturers who have agreed to pay statutorily specified rebates to those states. See 42 U.S.C. §1396r-8. Thus, pharmaceutical manufacturers that want their drugs available to Medicaid beneficiaries under the Medicaid program enter into a Rebate Agreement with the Department of Health and Human Services ("HHS") Secretary to provide rebates. See 42 U.S.C. §1396r-8(a)(1).

78.     The Rebate Agreement requires manufacturers to submit a Quarterly Report (Form CMS-367). The Quarterly Report includes information regarding each of the manufacturers' "Covered" Drugs, including such information as its "Average Manufacturer Price" ("AMP"), "Baseline AMP," and its "Best Price." Based upon this information, HHS, through its component agency, The Centers for Medicare & Medicaid Services ("CMS"), then tells the states how much rebate the state is entitled to collect with respect to each drug.

79.     MALLINCKRODT entered into a Rebate Agreement with HHS. In that Agreement, Defendant agreed to comply with 42 U.S.C. §1396r-8, and hence:

              a.      Agreed to report its Best Price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, etc.

              b.      Agreed that it would determine its Best Price based upon its AMP, calculated as "net sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include that in the calculation, cash discounts and all other price reductions "which reduce the actual price paid"; and

              c.      Agreed that the Best Price would not take into account nominal prices, defined as prices that are less than 10 percent of the AMP in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

80.     After execution of this Agreement, MALLINCKRODT reported its AMP and/or Best Price in each quarter, to the Medicaid Program on an electronic form of Form CMS-367.

81.     In the instant case, MALLINCKRODT failed to take into account the Kickbacks it paid as well as free goods, volume discounts, rebates, etc., when reporting its Best Price. As a result, MALLINCKRODT's Best Price, for quarterly reports submitted for at least the past 6 years, were inflated, which reduced the percentage difference between AMP and Best Price, thereby reducing the rebate amount that MALLINCKRODT ultimately paid to each state Medicaid program.

MALLINCKRODT artificially inflated its Best Price, by calculating its Best Price without taking into account its inducement activities, which reduced the true cost of its drugs. MALLINCKRODT did not take into account all of the inducements described in this Complaint, such as phony drug trials, phony speaker fees, phony preceptorships, phony speaker meetings, phony advisory panel meetings, and all other inducements described herein.

82. MALLINCKRODT knowingly set and reported its Best Price for these drugs at levels far higher than the actual Best Price, in Form CMS-367, submitted quarterly to CMS for at least the past 6 years. By doing so, MALLINCKRODT has violated the Federal (and applicable state) False Claims Acts, by knowingly making, using, or causing to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money to federal and state governments.

83. Under the Veterans Health Care Act of 1992 ("VHCA"), drug manufacturers are required to enter a pricing agreement with the Secretary of HHS for the section 340B Drug Pricing Program, and with the Department of Veterans Affairs (VA) and other Department of Defense programs.

84. Once a labeler/manufacturer enters into such a pricing agreement, its drugs are listed on the Federal Supply Schedule ("FSS"), a price list containing over twenty-thousand pharmaceutical products. The VA and other Government Programs depend on the FSS for most of its drug purchases, with the exception of several national contracts awarded for specific drugs considered to be therapeutically interchangeable.

85. Under the VHCA, drug manufacturers must comply with 38 U.S.C. § 8126. Subsection (a)(2) requires that "the price charged during the one-year period beginning on the date on which the agreement takes effect may not exceed 76 percent of the non-Federal average manufacturer price (less the amount of any additional discount required under subsection (c)) ...."

86. In the instant case, MALLINCKRODT failed to take into account its inducements when reporting the non-Federal average manufacturer price. MALLINCKRODT therefore violated 38 U.S.C. §8126 causing damage to the VA program, and by not giving its best price as set forth in subsection (a)(2), MALLINCKRODT became ineligible for Medicare and other federal program reimbursement.

**CONCLUSION**

87. The decision-making of the physician, that important element in Government Program coverage

policy was completely undermined by the Defendants' unlawful marketing. The physicians prescribing Tofranil-PM (brand and generic) and Restoril did not necessarily do so because they believed, based on their review of peer-reviewed medical literature, or discussions with their colleagues, that the drugs would help their patients; rather the drugs were often prescribed because the physicians were actively pursued with kickbacks.

**COUNT I—FALSE CLAIMS ACT**

88. Relator realleges and incorporates by reference paragraphs 1-87 as though fully set forth herein.

89. This is a claim by Relator, on behalf of the United States, for treble damages and penalties under the False Claims Act, 31 U.S.C. 3729-3733 against Defendants for knowingly causing to be presented false claims to Government Healthcare Programs. From on or about January 2002 through present, in the Northern District of California and elsewhere throughout the United States, Defendants have knowingly and willfully violated the False Claims Act by submitting and causing false claims to be submitted.

90. Defendants have knowingly caused pharmacies and other healthcare providers to submit Pharmacy, CMS-1500, and other claim forms for payment, knowing that such false claims would be submitted to state Government Healthcare Programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing prescriptions for prescriptions induced by kickbacks and/or for non-covered uses and therefore false claims. By virtue of the acts described in this Complaint, Defendants have knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of the False Claims Act including but not limited to 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(2).

91. For Tofranil-PM in particular, Defendants also knowingly made, used, or caused to be made or used false records and/or statements to get false or fraudulent claims paid or approved by the Government. Each prescription that was written as a result of Defendants' illegal marketing practices and illegal kickbacks represents a false or fraudulent record or statement.

92. Defendants have violated the False Claims Act by causing the states to submit false claims to the United States Government in Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for which federal reimbursement

was sought, including Tofranil-PM, were paid for in compliance with federal law. States submitted false claims to the United States Government because when Tofranil-PM was prescribed off-label, it was not prescribed for a medically accepted indication, yet states sought reimbursement from the United States Government for all Tofranil-PM expenditures.

93. Defendants caused false claims to be submitted, resulting in Government Program reimbursement to healthcare providers in the millions of dollars, in violation of the False Claims Act, 31 U.S.C. §3729 et. seq. and the Anti-Kickback Act 42 U.S.C. §1320a-7b(b)(2)(A).

94. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim presented or caused to be presented.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e) That the Court award such other and further relief as it deems proper.

## COUNT II
## ILLINOIS WHISTLEBLOWER REWARD & PROTECTION ACT

95. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

96. This is a *qui tam* action brought by RELATOR on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175

*et seq.*

97.     740 ILCS 175/3(a) provides liability for any person who:

> (1)     knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;
> (2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
> (3)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

98.     In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

99.     Defendants violated 305 ILCS 5/8A-3(b) by engaging in the conduct described herein.

100.     Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Illinois Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

101.     The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

102.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

103.     Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the

reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

104. As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

105. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of himself and the State of Illinois.

106. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF ILLINOIS:

(1) Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT III**

107. Plaintiff-Relator JOHN H. PRIEVE, by his attorneys, Oliver Close, LLC, for Count III of this Complaint, states as follows:

108. Defendant COVIDIEN, INC. is a corporation, which is a citizen of the State of Massachusetts. Its principal place of business is the Town of Mansfield, State of Massachusetts. Defendant is also subject to personal jurisdiction in Santa Clara County, California, in this

District. Defendant Covidien, Inc. is the general partner of Defendant Tyco Healthcare Group, L.P.

109. Defendant TYCO HEALTHCARE GROUP, L.P. is a limited partnership, which is a citizen of the State of Massachusetts. Its principal place of business is the Town of Mansfield, State of Massachusetts. Defendant is also subject to personal jurisdiction in Santa Clara County, California, in this District.

110. Plaintiff-Relator JOHN H. PRIEVE is a resident of the Village of Roscoe, County of Winnebago, State of Illinois. Plaintiff is a citizen of the State of Illinois.

111. This court has subject matter jurisdiction of this Count III, based on 28 U.S.C. §1331 and 1345, and 31 U.S.C. § 3732(a) and 3730.

112. This court has subject matter jurisdiction of this Count III, based on 28 U.S.C. §1332.

113. This court also has subject matter jurisdiction of this Count III, based on 28 U.S.C. §1367, as this case is so related to the other Counts in this case that it forms part of the same case or controversy.

114. Venue is proper for this Count III, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), in this Court, as the facts in this Count III make it part of the same cause of action as the other Counts in this case, and as this Count III arises from the same nucleus of operative facts as the other Counts in this case.

115. At all times during his employment by Defendants, Plaintiff worked in the County of Winnebago, State of Illinois.

116. On or about January 31, 2005, Tyco Healthcare, Inc. hired Plaintiff as District Manager, Chicago, for its Dosage Division of its Pharmaceutical Business.

117. In 2007, Tyco Healthcare, Inc. changed its name to Covidien, Inc., and Plaintiff continued to be employed by Defendants Tyco Healthcare Group, L.P. and Covidien, Inc. as District Manager, Chicago, for the Dosage Division.

118. During Plaintiff's employment with Defendants, Defendants paid physicians to present seminars or speaker programs for no business purpose and to assist the physicians with

their personal expenses, and paid physicians to perform market research, as a disguised way to reward the physicians for prescribing Defendants' products. Defendants' programs were called the Field Marketing Specialist program, and the Key Opinion Leader program.

119.    The seminars or speaker programs also violated Defendants' own policies, and industry codes which Defendants had adopted.

120.    Pursuant to 42 U.S.C. § 1320a-7b(b), United States law makes it a crime for drug manufacturers such as Defendants to offer inducements to physicians to influence the physicians' prescribing practices, when any federal healthcare program may pay for such prescriptions.

121.    The seminars or speaker programs also promoted uses of Defendants' drugs which had not been approved by the United States Food and Drug Administration ("off-label marketing").

122.    Off-label marketing is a violation of the Federal Food, Drug and Cosmetic Act. 21 U.S.C. §§ 331(a), (k), 352(f); 21 C.F.R. §§ 201.5, 201.128. Dissemination of a "misbranded" drug is a crime. 21 U.S.C. §§ 333(a)(1)-(2).

123.    Beginning on or about August 2006, and continuing thereafter, Plaintiff reported to Defendants on numerous occasions that Defendants' agents and employees were violating United States law by offering inducements to physicians to influence the physicians' prescribing practices, and to provide information to physicians to induce them to prescribe drugs for uses not approved by the FDA.

124.    In addition, beginning on or about August 2006, and continuing thereafter, Plaintiff repeatedly reported to Defendants that its seminars or speaker programs, known as the Field Marketing Specialist and Key Opinion Leader programs, were prohibited off-label marketing. Plaintiff also expressed concerns about Defendants' off-label marketing efforts in sales meetings and compliance training.

125.    Defendants' seminars or speaker programs constituted prohibited off-label marketing particularly as to Defendants' drug, Tofranil PM. Tofranil PM was only approved by the FDA to treat major depression. To promote Tofranil PM, Defendants obtained speakers who spoke about using Tofranil PM, not to treat depression, but for other purposes, such as migraine headache relief and pain relief. Defendants obtained neurologists, urologists, internal medicine physicians,

occupational medicine physicians, family practice physicians and other non-mental health related speakers to promote Tofranil PM.

126. In April 2008, Plaintiff filed a *qui tam* action in this case under seal.

127. On November 21, 2008, Defendants gave Plaintiff a lower performance review for its fiscal year 2008, which reduced Plaintiff's pay and prospects for promotion. The reasons for the lower review that Defendants stated to Plaintiff were that Plaintiff had failed to support Defendants' Field Marketing Specialist and Key Opinion Leader programs. Plaintiff again expressed concerns to Defendants, including especially his supervisors, that Defendants' marketing programs, such as the Field Marketing Specialist and Key Opinion Leader programs, offered inducements to physicians to influence prescriptions, and also induced physicians to prescribe drugs, especially Tofranil PM, for uses not approved by the FDA.

128. In January 2009, Defendants received a subpoena from the United States Department of Justice, and became aware that the United States Department of Justice was conducting an investigation, without identifying Plaintiff.

129. In February 2009, Defendants advised Plaintiff that his failure to support the Field Marketing Specialist and Key Opinion Leader programs could affect whether or not he was considered for a promotion when Defendants' sales force was expanded later in 2009.

130. In May 2009, Plaintiff assisted another employee of Defendants to report to Defendants that Defendants' agents and employees were violating United States law by offering inducements to physicians to influence the physicians' prescribing practices.

131. In May and June 2009, Defendants, through their attorneys, conducted extensive interviews with Plaintiff concerning Plaintiff's reports of Defendants' illegal conduct, alleged above, and concerning the report by another employee. Defendants repeatedly attempted to determine if Plaintiff was the person behind the United States Department of Justice investigation.

132. On or about June 26, 2009, Defendants reprimanded Plaintiff, allegedly for failing to report illegal conduct sufficiently.

133. Other employees of Defendants engaged in the illegal conduct that Plaintiff reported, or failed to report the illegal conduct, despite knowing about it, and were not reprimanded, or were

given generous severance packages and allowed to leave their employment with Defendants on favorable terms.

134. On or about July 6, 2009, Defendants changed Plaintiff's title to Senior Account Manager, Urology Sales, Imaging Systems, and assigned Plaintiff a new territory. The change in title and assignment removed Plaintiff from any contact with Defendants' speaker programs, and removed Plaintiff from any contact with Defendants' drug sales.

135. Plaintiff's new territory was composed of states with low population and few large medical providers, some states of which had not previously been assigned to anyone. In the new territory, Defendants assigned Plaintiff to sell expensive products, which were principally used by large medical providers in states with large populations. In the new territory, Defendants established for Plaintiff an annual sales goal which exceeded the total sales for such products in that territory for the previous ten years.

136. In January 2010, Defendants, through their attorneys, again conducted extensive interviews with Plaintiff concerning business practices in Defendants' pharmaceutical division, and Plaintiff's reports of Defendants' illegal conduct, alleged above. Defendants again repeatedly attempted to determine if Plaintiff was the person behind the United States Department of Justice investigation.

137. In March 2010, Defendants placed Plaintiff on a Corrective Action Plan, allegedly because Plaintiff failed to meet the sales goals Defendants had established for Plaintiff in the territory then assigned to him.

138. In July 2010, Defendants placed Plaintiff on a Performance Improvement Plan, allegedly because Plaintiff failed to meet the sales goals Defendants had established for Plaintiff in the territory then assigned to him.

139. Defendants and their attorneys again sought an interview with Plaintiff that was scheduled for September 9, 2010. Plaintiff scheduled an interview, but on September 9, 2010, declined to meet again with Defendants' attorneys.

140. On September 11, 2010, Defendants terminated Plaintiff's employment with an effective date of September 10, 2010. Defendants' stated reason for Plaintiff's termination, that Plaintiff had failed to meet his sales goal, was a pretext for termination because of Plaintiff's activities alleged

herein.

141. Defendants authorized Plaintiff's termination by their agents or employees, terminated Plaintiff by the action of a management employee acting within the scope of his employment, and approved Plaintiff's termination by their agents or employees.

142. Defendants terminated Plaintiff's employment because he reported to Defendants that Defendants' agents and employees were violating United States law by offering inducements to physicians to influence the physicians' prescribing practices and that Defendants was engaging in off-label marketing, and because Defendants believed that Plaintiff had provided the information that led to the filing of the *qui tam* action that is part of this case.

143. Plaintiff's reporting to Defendants that Defendants' agents and employees were violating United States law by offering inducements to physicians to influence the physicians' prescribing practices and his reporting that Defendants was engaging in off-label marketing, and Defendants' belief that Plaintiff had provided the information that led to the filing of the qui tam action that is part of this case, were proximate causes of Defendants' termination of Plaintiff.

144. At the time of Defendants' termination of Plaintiffs employment, Plaintiff was earning an annual salary of $127,831.69, and was receiving other employment benefits, including employee retirement plans, health plans and bonus and stock plans.

145. At the time Defendants terminated Plaintiff's employment, the False Claims Act provided relief for an employee discharged or otherwise discriminated against because of the employee's lawful acts in furtherance of his and others' efforts to stop violations of the False Claims Act. 31 U.S.C. § 3730(h)(1).

146. In violation of the False Claims Act, Defendants knowingly terminated or discharged Plaintiff, and otherwise discriminated against Plaintiff, because of Plaintiff's lawful acts in furtherance of efforts of his and others' efforts to stop violations of the False Claims Act. 31 U.S.C. § 3730(h)(1).

147. Defendants' termination of Plaintiff, and other discrimination against Plaintiff because of his lawful acts in furtherance of his and others' efforts to stop violations of the False Claims Act, deprived Plaintiff of the salary he would have earned, and of other employment benefits, including

employee retirement plans, health plans and bonus and stock plans.

148. Defendants acted maliciously and with wanton disregard for Plaintiff and his rights.

WHEREFORE this Court should enter judgment in favor of Plaintiff, JOHN H. PRIEVE, and against Defendants, COVIDIEN, INC. and TYCO HEALTHCARE GROUP, L.P., as follows:

1. For all relief necessary to make Plaintiff whole, pursuant to 31 U.S.C.§ 3730(h)(1).

2. For reinstatement to his employment at Defendants with the same seniority status that he would have had without Defendants' discrimination, pursuant to 31 U.S.C. § 3730(h)(2).

3. For two (2) times Plaintiff's back pay, with interest, pursuant to 31 U.S.C. § 3730(h)(2).

4. For compensation for any damages sustained as a result of the violation, including litigation costs, and reasonable attorney's fees, pursuant to 31 U.S.C. § 3730(h)(2).

5. For damages for emotional distress.

6. Granting Plaintiff such other and further relief as this Court deems just and proper, including without limitation pre and postjudgment interest, and punitive damages.

**COUNT IV**

149. Plaintiff-Relator JOHN H. PRIEVE, by his attorneys, Oliver Close, LLC, for Count IV of this Complaint, states as follows:

150. Plaintiff repeats the allegations of Paragraphs 106-148 of Count III as Paragraphs 149-158 of this Count IV.

151. This court has subject matter jurisdiction of this Count IV, based on 28 U.S.C. §1332.

152. This court also has subject matter jurisdiction of this Count IV, based on 28 U.S.C. §1367, as this case is so related to the other Counts in this case that it forms part of the same case or controversy.

153. Venue is proper for this Count IV, in this Court, as the facts in this Count IV make it part of the same cause of action as the other Counts in this case, and as this Count IV arises from the same

nucleus of operative facts as the other Counts in this case.

154. At the time Defendants terminated Plaintiff's employment, it was and continues to be the public policy of the State of Illinois to prohibit the termination of employees who are lawfully reporting violations of law to their employers and to the United States of America.

155. In violation of the public policy of the State of Illinois, and with conscious or reckless disregard for Plaintiff's rights, Defendants actually terminated Plaintiff's employment in retaliation for Plaintiff's lawful reporting of Defendants' violations of law to Defendants and to the United States of America.

156. As a direct and proximate result of the foregoing wrongful conduct of Defendants, Plaintiff has suffered serious and permanent damage in the form of lost wages and benefits, other economic losses, and severe mental anguish and emotional distress.

157. Defendants' actions were willful and wanton, and justice and the public good require an award of punitive damages.

158. Plaintiff has and will suffer damages in excess of $75,000.00, from loss of salary and other harms.

WHEREFORE this Court should enter judgment in favor of Plaintiff, JOHN H. PRIEVE, and against Defendants, COVIDIEN, INC. and TYCO HEALTHCARE GROUP, L.P., as follows:

1. For damages in excess of $75,000.00 as compensation for his injuries.

2. For punitive damages in an amount to be shown by the evidence.

3. For his costs of suit.

4. Granting Plaintiff such other and further relief as this Court deems just and proper.

**COUNT V**

159. Plaintiff-Relator JOHN H. PRIEVE, by his attorneys, Oliver Close, LLC, for Count V of this Complaint, states as follows:

160. Plaintiff repeats the allegations of Paragraphs 149 - 158 of Count IV as Paragraphs 159 - 163 of this Count V.

161. Defendants' actions, alleged above, violate 740 ILCS 174/15, Section 15 of the Illinois

Whistleblower Act.

162. Defendants' actions, alleged above, violate 740 ILCS 174/20, Section 20 of the Illinois Whistleblower Act.

163. Defendants' violations, alleged above, caused Plaintiff damage, as alleged above.

WHEREFORE this Court should enter judgment in favor of Plaintiff, JOHN H. PRIEVE, and against Defendants, COVIDIEN, INC. and TYCO HEALTHCARE GROUP, L.P., as follows:

1. For all relief necessary to make Plaintiff whole.

2. For reinstatement to his employment at Defendants with the same seniority status that he would have had without Defendants' violation.

3. For back pay, with interest.

4. For compensation for any damages sustained as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney's fees.

5. Granting Plaintiff such other and further relief as this Court deems just and proper.

**COUNT VI**
**CALIFORNIA FALSE CLAIMS ACT**

164. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

165. This is a *qui tam* action brought by Relator on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

166. Cal. Gov't Code § 12651(a) provides liability for any person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
> (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
> (4) is a beneficiary of an inadvertent submission of a false claim to the

> state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

167. In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

168. Defendants violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct described herein.

169. Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code § 650-650.1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

170. The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

171. Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

172. Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

173. As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has

been damaged in an amount far in excess of millions of dollars exclusive of interest.

174. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

175. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;
(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT VII
## COLORADO MEDICAL ASSISTANCE ACT

176. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

177. This is a *qui tam* action brought by Relator on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq*.

178. Colo. Rev. Stat § 25.5-4-305 provides that it is unlawful to:

(a) Intentionally or with reckless disregard make or cause to be made any false representation of a material fact in connection with a claim;

(b) Intentionally or with reckless disregard present or cause to be presented to the state department a false claim for payment or approval;

(c) Intentionally or with reckless disregard present or cause to be presented any cost document required by the medical assistance program that the person knows contains a false material statement...

179. In addition, the payment or receipt of bribes or kickbacks is prohibited under the Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-305 (1)(e).

180. Defendants furthermore violated Colorado Medical Assistance Act, Colo. Rev. Stat. § 25.5-4-305 *et seq*. and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq*. and Colo. Rev. Stat. § 25.5-4-305(1)(e) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs. The State of Colorado, by and through the Colorado Medical Assistance Act and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

181. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Colorado.

182. Had the State of Colorado known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

183. As a result of Defendants' violation of Colo. Rev. Stat § 25.5-4-305, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint,

who has brought this action pursuant to the Colorado Medical Assistance Act, Colo. Rev. Stat § 25.5-4-304 *et seq.* on behalf of himself and the State of Colorado.

184. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Colorado:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;
(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of Colorado;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Colorado Medical Assistance Act, Colo. Rev. Stat § 25.5-4-304 *et seq.* and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT VIII**
**CONNECTICUT FALSE CLAIMS ACT**

185. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

186. This is a *qui tam* action brought by Relator on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Public Act No. 09-5 *et seq.*, signed by the Governor on October 5, 2009.

Conn. Public Act No. 09-5 § 2(a) provides that no person shall:

> (1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under medical assistance programs administrated by the Department of Social Services;
> (2) Knowingly make, or cause to be made or used a false record or statement to secure the payment by the state of a false or fraudulent claim under medical assistance programs administered by the

Department of Social Services;
(3) Conspire to defraud the state by securing the allowance of payment of a false claim under medical assistance programs administered by the Department of Social Services.

187. In addition, the payment or receipt of bribes or kickbacks is prohibited under Connecticut False Claims Act, Public Act No. 09-5 § 16(a).

188. Defendants furthermore violated Conn. Public Act No. 09-5 § 2(a) and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Conn. Public Act No. 09-5 § 2(a) and § 16(a) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

189. The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

190. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Connecticut.

191. Had the State of Connecticut known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

192. As a result of Defendants' violation of Conn. Public Act No. 09-5 § 2(a), the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

193. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Connecticut False Claims Act, Public Act No. 09-5 *et seq.* on behalf of himself and the State of Connecticut.

194. This Court is requested to accept pendant jurisdiction over this related state claim as it is

predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Connecticut:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;
(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of Connecticut;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Public Act No. 09-5 *et seq*. and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT IX**
**DELAWARE FALSE CLAIMS AND REPORTING ACT**

195. Plaintiff repeats and realleges each allegation contained in paragraphs I through 87 above as if fully set forth herein.

196. This is a *qui tam* action brought by Relator on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

197. 6 Del. C. § 1201(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

198. In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the

furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

199. Defendants violated 31 Del. C. § 1005 by engaging in the conduct described herein.

200. Defendants furthermore violated 6 Del. C. § 1201(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws, including the FDCA, the Anti-Kickback Act, and 31 Del. C. § 1005 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

201. The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

202. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

203. Had the State of Delaware known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

204. As a result of Defendants' violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

205. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

206. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF DELAWARE:

(1) Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT X**
**FLORIDA FALSE CLAIMS ACT**

207. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

208. This is a *qui tam* action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

209. Fla. Stat. § 68.082(2) provides liability for any person who-

> (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;
> (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;
> (c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

210. In addition, Fla. Stat. § 409.920 makes it a crime to:

> (c) knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;
>
> * * *
>
> (e) knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

211. Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

212. Defendants violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging in the conduct described herein.

213. Defendants furthermore violated Fla. Stat. § 68.082(2) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

214. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

215. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with

applicable Florida statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

216. Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

217. As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

218. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

219. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Florida
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of' law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action,
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XI**
**GEORGIA FALSE MEDICAID CLAIMS ACT**

220. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

221. This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 (2008) *et seq.*

222. O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

> (1) knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;
> (3) conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

223. Defendants violated O.C.G.A. § 49-4-168 *et seq.* by engaging in the conduct described herein.

224. Defendants furthermore violated O.C.G.A. § 49-4-168 and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

225. The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

226. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes, regulations and Pharmacy Manuals was also an express condition

of payment of claims submitted to the State of Georgia.

227. Had the State of Georgia known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

228. As a result of Defendants' violation of O.C.G.A. § 49-4-168, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

229. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to O.C.G.A. § 49-4-168 on behalf of himself and the State of Georgia.

230. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Georgia:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XII**
**HAWAII FALSE CLAIMS ACT**

231. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

232. This is a *qui tam* action brought by Relator on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

233. Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or d by the state;
> (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or
> (8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

234. Defendants violated Haw. Rev. Stat. §661-21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

235. The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

236. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

237. Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

238. As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

239. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

240. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' illegal conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Hawaii;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XIII**
**INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

241.  Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

242.  This is a *qui tam* action brought by Relator on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, INDIANA Code 5-11-5.5 et seq:

> (b) A person who knowingly or intentionally:
>
> (1) presents a false claim to the state for payment or approval;
> (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
> (3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;
> (4) with intent to defraud the state, authorizes issuance of a receipt without knowing that
> (5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;
> (6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;
> (7) conspires with another person to perform an act described in subdivisions (1) through (6); or
> (8) causes or induces another person to perform an act described in subdivisions (1) through (6)...
>
> a penalty or damages.

243.  In addition, INDIANA Code 5-11-5.5 et seq. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Indiana Medicaid program.

244.  Defendants violated the INDIANA Code 5-11-5.5 et seq. by engaging in the conduct described herein.

245.  Defendants furthermore violated INDIANA Code 5-11-5.5 et seq. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Indiana Vendor Fraud and Kickback statute, and by virtue of the fact that none

of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

246. The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

247. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

248. Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

249. As a result of Defendants' violations of INDIANA Code 5-11-5.5 et seq., the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

250. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to INDIANA Code 5-11-5.5 et seq. on behalf of himself and the State of Indiana.

251. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF Indiana:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to INDIANA Code 5-11-5.5 et seq. and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XIV**
**LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**

252. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

253. This is a *qui tam* action brought by Relator on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

254. La. Rev. Stat. Ann. § 438.3 provides-

> (A) No person shall knowingly present or cause to be presented a false or fraudulent claim;
> (B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;
> (C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

255. In addition, La. Rev. Stat. Ann. § 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

256. Defendants violated La. Rev. Stat. Ann. § 438.2(A) by engaging in the conduct described herein.

257. Defendants furthermore violated La. Rev. Stat. Ann. §438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. Ann. § 438.2(A), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

258. The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

259. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

260. Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

261. As a result of Defendant's violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

262. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of himself and the State of Louisiana.

263. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF LOUISIANA:

(1) Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XV**
**MARYLAND FALSE HEALTH CLAIMS ACT OF 2010**

264. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

265. This is a qui tam action brought by Relator on behalf of the State of Maryland to recover treble damages and civil penalties under the Md. Health General Code Subtitle 6 §§ 2-601 et seq.

266. Md. Health General Code Subtitle 6 § 2-602 provides in pertinent part:

(a) A person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;
(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim ...

***

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

267. Defendants furthermore violated Md. Health General Code Subtitle 6 § 2-602 et seq. and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

268. The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

269. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct. Compliance with applicable Maryland statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Maryland.

270. As a result of Defendants' violation of Md. Health General Code Subtitle 6 § 2-602 et seq., the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

271. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Md. Health General Code Subtitle 6 § 2-602 et seq. on behalf of himself and the State of Maryland.

272. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

273. To the State of Maryland:

      (1) Three times the amount of damages that the State of Maryland sustains as a result of Defendants' conduct;
      (2) A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State Maryland;
      (3) All costs incurred in bringing this action.

To Relator:

      (1) The maximum amount allowed pursuant to Md. Health General Code Subtitle 6 § 2-602 et seq. and/or any other applicable provision of law;
      (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
      (3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XVI**
**MICHIGAN MEDICAID FALSE CLAIMS ACT**

274. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

275. This is a *qui tam* action brought by Relator on behalf of the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act, MI ST Ch. 400.603 et seq.

276. 400.603 provides liability in pertinent part as follows:

> Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits;
> (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit...

277. In addition, MI ST Ch. 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

278. Defendants violated MI ST Ch. 400.603 et seq. by engaging in the conduct described herein.

279. Defendants furthermore violated, MI ST Ch. 400.603 et seq. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

280. The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

281. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with

applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

282.    Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

283.    As a result of Defendants' violations of MI ST Ch. 400.603 et seq. the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

284.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to MI ST Ch. 400.603 et seq. on behalf of himself and the State of Michigan.

285.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF Michigan:

(1)    Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;
(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relator:

(1)    The maximum amount allowed pursuant to MI ST Ch. 400.603 et seq. and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3)    An award of reasonable attorneys' fees and costs; and
(4)    Such further relief as this Court deems equitable and just.

## COUNT XVII

## MINNESOTA FALSE CLAIMS ACT

286. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

287. This is a qui tam action brought by Relator on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01, et seq.

288. Minn. Stat. § 15C.02 provides civil liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;
>
> (3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;...

289. In addition, the State of Minnesota prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Minnesota False Claims Act. Defendants violated Minn. Stat. § 15C.01, et seq. by engaging in the conduct described herein.

290. Defendants furthermore violated, Minn. Stat. § 15C.01, et seq. and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

291. The State of Minnesota, by and through the Minnesota False Claims Act program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

292. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Minnesota.

293. Had the State of Minnesota known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

294. As a result of Defendants' violation of Minn. Stat. § 15C.01, et seq. the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

295. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Minn. Stat. § 15C.01, et seq. on behalf of himself and the State of Minnesota.

296. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Minnesota:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;
(2) A civil penalty equal to the full amount received for each false claim which Defendants caused to be presented to the State of Minnesota;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Minn. Stat. § 15C.01, et seq. and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XVIII**

**NEVADA FALSE CLAIMS ACT**

297. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

298. This is a *qui tam* action brought by Relator on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, *et. seq.*

299. N.R.S. § 357.040(1) provides liability for any person who-

> (a) knowingly presents or causes to be presented a false claim for payment or approval;
> (b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim
> (c) conspires to defraud by obtaining allowance or payment of a false claim;
> (h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

300. In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

301. Defendants violated N.R.S. § 422.560 by engaging in the conduct described herein.

302. Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.R.S. § 422.560, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

303. The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

304. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of

claims submitted to the State of Nevada in connection with Defendant's conduct. Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

305. Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

306. As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

307. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself and the State of Nevada.

308. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action..

To Relator:

(1) The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT XIX
## THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS LAW

309. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

310. This is a *qui tam* action brought by Relator on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Health Care False Claims Law, N.H. Rev.Stat. Ann§167:61-b.

311. Any person shall be liable who...

> (a) knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
> (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

312. In addition, N.H. Rev.Stat. Ann. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Hampshire Medicaid program.

313. Defendants violated the N.H. Rev.Stat. Ann by engaging in the conduct described herein.

314. Defendants furthermore violated N.H. Rev.Stat. Ann. §167:61-b, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the New Hampshire Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

315. The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

316. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of

claims submitted to the State of New Hampshire in connection with Defendants' conduct. Compliance with applicable New Hampshire statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

317. Had the State of New Hampshire known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

318. As a result of Defendants' violations of N.H. Rev.Stat. Ann. §167:61-b, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

319. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.H. Rev.Stat. Ann. §167:61-b on behalf of himself and the State of New Hampshire.

320. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of New Hampshire in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF New Hampshire:

(1) Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Hampshire;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT XX
## NEW JERSEY FALSE CLAIMS ACT

321. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

322. This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.* (2008) *et seq.*

323. N.J. Stat. § 2A:32C-3 provides liability for any person who:

> (a) knowingly presents, or causes to be presented, to an employee, officer, or agent of the State or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
>
> (c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

324. In addition, Section 17 of P.L. 1968, c.413 (C.30:4D-17) of the New Jersey False Claims Act prohibits the solicitation, offer or receipt of any remuneration, including any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid program.

325. Defendants violated Section 17 of P.L. 1968, c.413 (C.30:4D-17) by engaging in the conduct described herein.

326. Defendants furthermore violated N.J. Stat. § 2A:32C-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the New Jersey False Claims Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

327. The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

328. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Jersey.

329. Had the State of New Jersey known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

330. As a result of Defendants' violation of N.J. Stat. § 2A:32C-1 *et seq.*, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.J. Stat. § 2A:32C-1 *et seq.* on behalf of himself and the State of New Jersey.

331. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of New Jersey:

    (1)   Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

    (2)   A civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act (31 U.S.C. s.3729 *et seq.*) which Defendants caused to be presented to the State of New Jersey;

    (3)   Prejudgment interest; and

    (4)   All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.* and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT XXI
## NEW MEXICO MEDICAID FALSE CLAIMS ACT

332. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

333. This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act N.M. Stat. Ann§§ 27-14-1 et seq.

334. Section 3 provides liability in pertinent part as follows:

> A. A person shall not:
> (1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds a false or fraudulent claim for payment or approval;;
> (2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;
> (3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim...

335. In addition, N.M. Stat. Ann§§ 30-44-7 et seq. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

336. Defendants violated N.M. Stat. Ann§§ 30-44-7 et seq by engaging in the conduct described herein.

337. Defendants furthermore violated, N.M. Stat. Ann§§ 27-14-1 et seq. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

338. The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

339. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with applicable New Mexico statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

340. Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

341. As a result of Defendants' violations of N.M. Stat. Ann§§ 27-14-1 et seq. the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

342. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann§§ 27-14-1 et seq. on behalf of himself and the State of New Mexico.

343. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF New Mexico:

(1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann§§ 27-14-1 et seq. and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXII**
**NEW YORK FALSE CLAIMS ACT**

344. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

345. This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York False Claims Act, 2007 N.Y. Laws 58, Section 39, Article XIII

346. Section 189 provides liability for any person who:

1.(a) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;
1. (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government;
1. (c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

347. In addition, the New York State Consolidated Laws prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New York Medicaid program.

348. Defendants violated the New York State Consolidated Laws by engaging in the conduct described herein.

349. Defendants furthermore violated 2007 N.Y. Laws 58, Section 39, Article XIII, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New York by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-

Kickback Act, and the New York Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

350. The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

351. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New York.

352. Had the State of New York known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

353. As a result of Defendants' violations of 2007 N.Y. Laws 58, Section 39, Article XIII, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

354. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, on behalf of himself and the State of New York.

355. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF New York:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT XXIII
## NORTH CAROLINA FALSE CLAIMS ACT

356. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

357. This is a qui tam action brought by Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 et seq.

358. N.C. Gen. Stat. § 1-607(a) provides liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section;

***

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

359. In addition, North Carolina Statutes prohibit the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the North Carolina Medicaid program.

360.    Defendants violated N.C. Gen. Stat. § 1-607(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and the North Carolina False Claims Act N.C. Gen. Stat. § 1-605 et seq., and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

361.    The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

362.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct. Compliance with applicable North Carolina statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of North Carolina.

363.    Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein, and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs, or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

364.    As a result of Defendants' violation of N.C. Gen. Stat. § 1-605 et seq., and its anti kickback statutes, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

365.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.C. Gen. Stat. § 1-605(b) on behalf of himself and the State of North Carolina.

366.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of North Carolina:

(1) Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of North Carolina;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.C. Gen. Stat. § 1-605 et seq. and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXIV**
**OKLAHOMA MEDICAID FALSE CLAIMS ACT**

367. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

368. This is a qui tam action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act 63 Okl. St. § 5053 (2008) et seq.

369. 63 Okl. St. § 5053.1 (2)(B) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

370. In addition, 56 Okl. St. § 1005 (2008) of the Oklahoma Medicaid Program Integrity Act prohibits the solicitation or receipt of any benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

371. Defendants violated 56 Okl. St. § 1005 et seq. by engaging in the conduct described herein.

372. Defendants furthermore violated 63 Okl. St. § 5053.1 et seq. and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Oklahoma Medicaid Program Integrity Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

373. The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

374. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Oklahoma.

375. Had the State of Oklahoma known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

376. As a result of Defendants' violation of 63 Okl. St. § 5053.1 et seq., the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

377. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okl. St. § 5053.1 et seq. on behalf of himself and the State of Oklahoma.

378. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Oklahoma:

(1) Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to 63 Okl. St. § 5053.1 et seq. and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXV**
**RHODE ISLAND STATE FALSE CLAIMS ACT**

379. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

380. This is a qui tam action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act R.I.Gen. Laws § 9-1.1-1 (2008) et seq.

381. R.I. Gen. Laws § 9-1.1-3 provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

382. In addition, R.I. Gen. Laws § 40-8.2-3(2)(I) prohibits the solicitation, receipt, offer or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Rhode Island Medicaid program.

383. Defendants violated R.I. Gen. Laws § 40-8.2-3 et seq. by engaging in the conduct described herein.

384. Defendants furthermore violated R.I.Gen. Laws § 9-1.1-1 and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Rhode Island General Laws and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

385. The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

386. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

387. Had the State of Rhode Island known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

388. As a result of Defendants' violation of R.I. Gen. Laws § 9-1.1-1, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

389. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to R.I. Gen. Laws § 9-1.1-1 et seq. on behalf of himself and the State of Rhode Island.

390. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Rhode Island:

(1) Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-1 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXVI**
**TENNESSEE FALSE CLAIMS ACT**

391. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

392. This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

393. § 71-5-182(a)(1) provides liability for any person who-

> (A) presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;
> (B) makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;
> (C) conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

394. Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

395. The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

396. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

397. Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

398. As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

399. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

400. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Tennessee;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXVII**
**TEXAS FALSE CLAIMS ACT**

401. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

402. This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

403. V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

> (1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:
> (a) on an application for a contract, benefit, or payment under the Medicaid program; or
> (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program.
>
> (2) knowingly or intentionally concealing or failing to disclose an event:
> (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of.
> (I) the person, or
> (ii) another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and
> (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;
>
> (4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
> (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;
>
> (5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the

service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

404.    Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas  by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-kickback Act and § 36.002, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

405.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

406.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct.  Compliance with applicable Texas statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

407.    Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

408.    As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

409.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

410. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

411. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum.. Res. Code § 36.025(a)(3) for each false claim which Defendants cause to be presented to the state of Texas;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXVIII**
**WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT**

412. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

413. This is a qui tam action brought by Relator on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 et seq.

414. Wis. Stat. § 20.931(2) provides liability for any person who:

(a) Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
(b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

      (c) conspires to defraud this State by obtaining allowance or payment of claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance Program;

***

(g) knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance Program.

415. In addition, Wis. Stat. § 49.49(2) of the Wisconsin Public Assistance Code prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Wisconsin Medicaid program.

416. Defendants violated Wis. Stat. § 49.49(2) by engaging in the conduct described herein.

417. Defendants furthermore violated Wis. Stat. § 20.931 et seq. and knowingly caused false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Wisconsin Public Assistance Code and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

418. The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

419. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Wisconsin in connection with Defendants' conduct. Compliance with applicable Wisconsin statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Wisconsin.

420. Had the State of Wisconsin known that false representations were made to both the FDA and to practitioners about the true state of affairs regarding the safety and efficacy of the subject drugs, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

421. As a result of Defendants' violation of Wis. Stat. § 20.931 et seq. , the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

422. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Wis. Stat. § 20.931 et seq. on behalf of himself and the State of Wisconsin.

423. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Wisconsin:

(1) Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Wisconsin;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Wis. Stat. § 20.931 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## COUNT XXIX
## MASSACHUSETTS FALSE CLAIMS ACT

424. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

425. This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5(A) *et seq.*

426. Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or
> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;
> (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

427. In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

428. Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging in the conduct described herein.

429. Defendants furthermore violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Mass. Gen. Law Ann. Chap. 118E § 41 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

430. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

431. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief: also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

432. Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

433. As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

434. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of himself and the Commonwealth of Massachusetts.

435. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, §5F and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXX**
**COMMONWEALTH OF VIRGINIA**

436. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

437. This is a *qui tam* action brought by Relator on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act §8.01-216.3a provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or
> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;
> (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

438. In addition, VA Code ANN § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

439. Defendants violated VA Code ANN § 32.1-315 by engaging in the conduct described herein.

440. Defendants furthermore violated Virginia Fraud Against Tax Payers Act §8.01-216.3a and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, VA Code ANN § 32.1-315 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

441. The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

442. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

443. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

444. As a result of Defendants' violations of Virginia Fraud Against Tax Payers Act §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

445. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia Fraud Against Tax Payers Act §8.01-216.3 on behalf of himself and the Commonwealth of Virginia.

446. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth Of Virginia:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to VA Code ANN § 32.1-315 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT XXXI**
**DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT**

447. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

448. This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 *et seq.*

449. D.C. Code § 2-308.14(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;
> (2) knowingly makes, uses, or causes to: be made or used, a false record or statement to get a false claim paid or approved by the District;
> (3) conspires to defraud the District by getting a false claim allowed or paid by the District;
> (8) is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

450. In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

> (1) Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program, or
> (2) Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

451. Defendants violated D.C. Code § 4-802(c) by engaging in the illegal conduct described herein.

452. Defendants furthermore violated D.C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act D.C. Code § 4-802(c), and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the government-funded healthcare programs.

453. The District of Columbia, by and through the District of Columbia Medicaid program and other state healthcare programs, and unaware of Defendants' illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

454. Compliance with applicable Medicare, Medicaid and the various other federal and stale laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' illegal conduct. Compliance with applicable D.C. statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the District of Columbia.

455. Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

456. As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

457. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

458. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damages to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

DATED: April 21, 2011.

NOLAN & AUERBACH, P.A.

By: [signature]

Matthew Pavone
CA SBN 95964
Courtyard Square
750 Grant Avenue, Suite 250
Novato, CA 94965
(415) 209-9610
(415) 892-0337

Kenneth J. Nolan, Esq.
Marcella Auerbach, Esq.
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
(954) 779-3943
(954) 779-3937

JOHN H. PRIEVE, Plaintiff

(Employment Counts Only)
John Rearden, Jr., Esq.
Oliver Close, LLC
P. O. Box 4749, Suite 300
124 North Water Street
Rockford, IL 61110-4749
Telephone 815/963-0009

**PROOF OF SERVICE**

I am employed in the County of Broward, Florida, over the age of eighteen years, and not a party to the within action. My business address is NOLAN & AUERBACH, P.A.435 N. Andrews Avenue, Suite 401, Fort Lauderdale, FL 33301.

On the date set forth below, I served the document entitled:

**SECOND AMENDED FALSE CLAIMS ACT COMPLAINT**

to the following:

Ms. Julie Arbuckle
Assistant U.S. Attorney
U.S. Attorney's Office, N. D. California
450 Golden Gate Ave., 9th Floor
San Francisco, CA 94102-3495

Mr. Alan S. Gale, Esq.
U.S. Department of Justice
601 D Street, NW
PHB 9006
Washington, DC 20004-2904

Ms. Kay Lauterbach
Sr. Assistant Attorney General
Bureau of Medi-Cal Fraud and Elder Abuse
1425 River Park Dr. Ste. 300
Sacramento, CA 95815

Mr. George A. Codding
Senior Assistant Attorney General
Civil Enforcement
Colorado MFCU
1525 Sherman St., 2nd Floor
Denver, CO 80203

Mr. George Jepsen
Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06141-0120

Mr. Joseph R. Biden, III
Attorney General
Office of the Attorney General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

Mr. Peter J. Nickles, AG
Office of the Attorney General
Government of the District of Columbia
One Judiciary Square
441 4th Street N.W., Suite 1145S
Washington, DC 20001

Mr. Mark G. Bodner
Bureau Chief
Complex Civil Enforcement Bureau
Medicaid Fraud Control Unit
Office of the Attorney General
The Capitol
Tallahassee, FL 32399-1050

Mr. Jeff Atwater
Chief Financial Officer
200 East Gaines Street
Tallahassee, FL 32399-0300

Mr. Sam Olens
Attorney General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334 - 1300

Mr. David Louie
Attorney General
Office of the Attorney General
425 Queen St.,
Honolulu, HI 96813

Robert A. Barba, J.D., LL.M
Assistant Attorney General
Office of the Illinois Attorney General
100 West Randolph, 12th Floor
Chicago, IL 60601

Mr. Greg Zoeller
Attorney General
Office of the Attorney General
8005 Castleway Drive
Indianapolis, IN 46250

Mr. David Thomas
Inspector General
315 West Ohio Street
State Library
Indianapolis, IN 46202

Mr. James D. "Buddy" Caldwell
Attorney General
Office of the Attorney General
1885 North 3rd Street
Baton Rouge, LA 70802

Mr. Douglas F. Gansler
Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Ms. Martha Coakley
Attorney General
Office of the Attorney General
1 Ashburton Place
Boston, MA 02108-1698

Mr. Bill Schuette
Attorney General
C/O Health Care Fraud Division
2860 Eyde Park Way
P.O. Box 30218
Lansing, MI 48909

Ms. Lori Swanson
Attorney General
Office of the Attorney General
State Capitol, Suite 102
St. Paul, MN 55155

Mr. Roy Cooper
Attorney General
Office of the Attorney General
9001 Mail Service Center
Raleigh, NC 27699-9001

Ms. Catherine Cortez Masto
Attorney General
Office of the Attorney General
Old Supreme Ct. Bldg.
100 N. Carson St.
Carson City, NV 89701

Mr. Jeffrey Cahill
Director
Medicare Fraud Control Unit
33 Capitol St.
Concord, NH 03301

Ms. Paula T. Dow
Attorney General
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street, CN 080
Trenton, NJ 08625

Mr. Gary King
Attorney General
Office of the Attorney General
408 Galisteo Street
Villagra Building
Sante Fe, NM 87501

Mr. Eric Schneiderman
Attorney General
Office of the Attorney General
Dept. of Law
The Capitol, 2nd FL
Albany, NY 12224

Mr. Scott Pruitt
Attorney General
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Mr. Peter Kilmartin
Attorney General
Office of the Attorney General
150 S. Main St.
Providence, RI 02903

Mr. Robert E. Cooper, Jr.
Attorney General
Office of the Attorney General
425 5th Avenue North
Nashville, TN 37243

Ms. Noelle C. Letteri
Assistant Attorney General
Office of the Texas Attorney General
Antitrust & Civil Medicaid Fraud Division
6330 Hwy 290 E, Ste. 250
Austin, TX 78723

Mr. Ken Cuccinelli
Attorney General
Office of the Attorney General
900 East Main Street 5th Floor
Richmond, VA 23219

Mr. J.B. Van Hollen
Attorney General
Office of the Attorney General
Risser Justice Center
17 West Main Street
Madison, WI 53707-7857

☐ **By facsimile machine** (FAX) pursuant to CCP § 1013, by personally transmitting a true copy thereof via an electronic facsimile machine.

☒ **By first class mail** pursuant to CCP § 1013, by placing a true copy thereof in a sealed envelope with the postage fully prepaid and deposited with the United States Postal Service that same day.

☐ **By first class mail** pursuant to CCP § 1013 by placing a true copy thereof in a sealed envelope with the postage fully prepaid in the firm's outgoing daily mail box, knowing that the mail would be deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **By overnight mail** pursuant to CCP § 1013, by depositing in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for.

I declare under penalty of perjury under the laws of the State of Florida that the above is true and correct and was executed on April 21, 2011, at Fort Lauderdale, Florida.

Ashley M. Benitez, Paralegal